**WORLD WIDE RUSH, LLC, a Pennsylvania corporation, and Insite Outdoor Works LA, LLC, a Delaware limited liability company, Plaintiffs,**

v.

**CITY OF LOS ANGELES, a California municipal corporation and Doe 1 through Doe 10, inclusive, Defendant.**

**No. CV 07–238 ABC (JWJx).**

United States District Court,
C.D. California.

Aug. 20, 2008.

Amended Judgment and Permanent Injunction Aug. 26, 2008.

Michael C. Small, Akin Gump Strauss Hauer & Feld, Los Angeles, CA, Paul E. Fisher, Paul E. Fisher Law Office, Newport Beach, CA, for Plaintiffs.

Kenneth T. Fong, Los Angeles City Attorney's Office, Los Angeles, CA, Michael J. Bostrom, Deputy City Hall, Los Angeles, CA, Rockard J. Delgadillo, Los Angeles City Attorney's Office, Criminal and Special Litigation Branch, Los Angeles, CA, for Defendants.

**ORDER RE: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

AUDREY B. COLLINS, District Judge.

Pending before the Court is Plaintiffs World Wide Rush, LLC and Insite Outdoor Works LA, LLC's ("Plaintiffs") Motion for Summary Judgment, filed on July 24, 2008. Defendant City of Los Angeles (the "City") opposed on August 4, 2008 and Plaintiffs replied on August 11, 2008. The Court finds this matter appropriate for resolution without oral argument and VACATES the August 18, 2008 hearing date. *See* Fed. R. Civ. Proc. 78; Local Rule 7–15. After considering the papers and case file in this matter, the Court GRANTS Plaintiffs' motion.

## I. PROCEDURAL AND FACTUAL BACKGROUND[1]

Plaintiffs' current motion rests on the identical grounds addressed by the Court in its June 9, 2008 Order granting Plaintiffs' motion for preliminary injunction. The facts are undisputed. Plaintiffs are licensed to engage in the business of leasing outdoor advertising space for advertisers to erect signs in the City of Los Angeles. Plaintiffs lease 21 sign sites[2] within the City and the signs do not typically advertise goods or services available on the premises where they are located. Some of these signs are located within 2,000 feet of a freeway.

The City regulates outdoor signs through its "sign ordinance," Section 14 of Article 4.4 of the Los Angeles Municipal

---

1. The City asserts various evidentiary objections. The Court has considered them and has not relied on any inadmissible evidence in granting Plaintiffs' motion.

2. Since the Court imposed the preliminary injunction in this case, Plaintiffs have indicated that they were unable to secure a lease for the site at 15300 Ventura Blvd. and the City

has indicated that Plaintiffs have dropped 12 other sites from the scope of the preliminary injunction. The Court addresses the effect of these revisions in a separate Order ruling on Proposed Intervenor Community Redevelopment Association, LLC d.b.a. Liberty Media Group's Ex Parte Application to Intervene (Docket No. 122). For the purposes of this Order, only 21 sites remain at issue.

Code ("LAMC"). The sign ordinance defines "off-site" signs as:

A sign that displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where the sign is located.

Section 14.4.2 (also defining "on-site" signs as "[a] sign that is other than an off-site sign."). A "supergraphic sign" is:

A sign, consisting of any image projected onto a wall or printed on vinyl, mesh, or other material with or without written text, supported and attached to a wall by an adhesive and/or by using standard cable and eye-bolts and/or other material or methods and which does not comply with

[certain other provisions of the sign ordinance].

*Id.*

The sign ordinance imposes a blanket ban on all off-site and supergraphic signs, unless the proposed signs are "specifically permitted pursuant to a legally adopted specific plan, supplemental use district, [or] an approved development agreement." Section 14.4.4(B)(9), (11). Off-site signs are also exempt from the blanket ban if they are "specifically permitted pursuant to ... a relocation agreement entered into pursuant to California Business and Professions Code Section 5412." Section 14.4.4(B)(11).

A separate provision of the sign ordinance regulates signs with "Freeway Exposure": "No person shall erect, construct, install, paint, maintain, and no building or electrical permit shall be issued for, any sign or sign support structure within 2,000 feet of a freeway...." Section 14.4.6. This ban exempts signs that the City's "Department of Building and Safety ...

determine[s] will not be viewed primarily from a main traveled roadway of a freeway or an on-ramp/off-ramp." *Id.* "Viewed primarily from" a freeway means "that the message may be seen with reasonable clarity for a greater distance by a person traveling on the main traveled roadway or freeway or on-ramp/off-ramp than by a person traveling on the street adjacent to the sign." *Id.* This provision has two exceptions:

- Signs that "identify the building where the sign is located" are exempted, so long as "the area of the sign is not more than 50 square feet or is not larger than five percent of the area of the side of the building, which faces primarily to the freeway, which ever is greater[.]"

- Wall signs are also exempted "on which the advertising is limited to the name of any person, firm, or corporation occupying the building, or the type of business, services rendered, or the name of any product manufactured or sold on the premises," so long as "[t]he total area of all wall signs on a building permitted in this subdivision shall not exceed 100 square feet [and][a]ny one sign shall not exceed 50 square feet in area."

*Id.* § 14.4.6B 1, 2. The "Freeway Exposure" provision also exempts signs that are "specifically permitted pursuant to a legally adopted specific plan, supplemental use district, [or] an approved development agreement." Section 14.4.4(B)(9), (11).

So far, the City has enforced the sign ordinance against seven of Plaintiffs' sign locations. The City's Orders to Comply for these sites alleged that the signs are unpermitted "supergraphic" signs. Plaintiffs have applied for permits for these sites, which have been denied. One site at 6081 Center Drive has been subject to criminal prosecution and the City has

threatened criminal prosecution for the other six sites.

This litigation has been pending since January 2007. The City moved to dismiss Plaintiffs' initial complaint and the Court partially granted that motion, allowing Plaintiffs to pursue their facial unfettered discretion and overbreadth challenges to certain aspects of the sign ordinance. The Court ruled that most of Plaintiffs' other challenges, including their as-applied challenges, failed because they did not allege that the City had taken (or was likely to take) any enforcement efforts against their sign sites. After this ruling, Plaintiffs declined to file an amended complaint.

In January 2008, Plaintiffs moved for a preliminary injunction based upon claims that either had not survived the motion to dismiss or were never alleged in Plaintiffs' complaint to begin with. To compound Plaintiffs' problems, the deadline to amend the pleadings in the Scheduling Order had passed. The Court declined to rule on the motion for preliminary injunction, instead ordering Plaintiffs to move to amend the Scheduling Order. Plaintiffs so moved the Court, and, although the Court initially denied Plaintiffs' motion to add new claims to its complaint, the Court ultimately allowed Plaintiffs to filed an amended and supplemental complaint adding facts to allege standing and asserting new claims. The Court also reopened discovery.

In lieu of filing an answer, the City filed a motion to dismiss Plaintiffs' amended complaint, which the Court partially granted in the June 9, 2008 Order. The Court also partially granted Plaintiffs' motion for a preliminary injunction, concluding that Plaintiffs were likely to prevail on two of their claims, namely their facial challenge to sections 14.4.4B(9) and 14.4.4B(11) because those provisions unfettered discretion to City officials to deny signs, and their as-applied challenge to section 14.4.6 because this provision constitutes an impermissible restriction on commercial speech. The Court recognized that Plaintiffs had other claims that survived the Court's Order, but Plaintiffs have since indicated that they will abandon those additional claims in favor of the two identified above should the Court grant their motion for summary judgment. Therefore, the Court will focus only on those claims in this Order.

## II. LEGAL STANDARD

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *See Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [that party's] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce any evidence showing the absence of a genuine issue of

material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead ... the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the non-moving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505. However, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

## III. DISCUSSION

This case involves no disputed facts and Defendants have provided no persuasive reason why the Court should deviate from its decision granting Plaintiffs' motion for preliminary injunction. As a result, the foregoing analysis largely tracks the Court's June 9, 2008 Order.

### A. Plaintiffs' Facial Unfettered Discretion Challenge to Sections 14.4.4(B)(9) and 14.4.4(B)(11)

■■■ Plaintiffs move for summary judgment on their claims that the exceptions to the off-site and supergraphic sign bans found in Section 14.4.4(B)(9) and 14.4.4(B)(11) as giving the City unfettered discretion to restrict speech. An ordinance violates the First Amendment "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit." *G.K. Ltd. Travel v. City of Lake Oswego,* 436 F.3d 1064, 1082 (9th Cir.2006) (quoting *Thomas v. Chicago Park Dist.,* 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002)). For this reason, "a law cannot condition the free exercise of First Amendment rights on the 'unbridled discretion' of government officials." *Desert Outdoor Advertising v. City of Moreno Valley,* 103 F.3d 814, 818 (9th Cir.1996). "This requirement seeks to 'alleviate the threat of content-based, discriminatory enforcement that arises where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit.'" *Outdoor Media Grp., Inc. v. City of Beaumont,* 506 F.3d 895, 903–04 (9th Cir.2007) (quoting *G.K. Ltd. Travel,* 436 F.3d at 1082). Therefore, a regulation must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Id.* at 904.

Three Ninth Circuit cases guide the Court's analysis in the specific context of billboard regulations like the sign ordinance at issue here. *See id.; Desert Outdoor,* 103 F.3d at 818–19; *G.K. Ltd. Travel,* 436 F.3d at 1082–84. First, in *Outdoor Media,* the plaintiff sought a permit under a scheme that allowed city officials to approve a permit application within 15 days if it was "in conformance with this Chapter and [ ] consistent with its intent and pur-

pose." *Outdoor Media,* 506 F.3d at 904. The "intent and purpose" of the City's sign ordinance included "encouraging 'a desirable urban character which has a minimum of overhead clutter,' enhancing the 'economic value of the community and each area thereof through the regulation of the size, number, location, design and illumination of signs,' and encouraging 'signs which are compatible with on-site and adjacent land uses.'" *Id.* (quoting sign ordinance). The sign ordinance defined off-site signs as the City does here, and the city in that case also had a restriction on freeway-visible signage: "the planning commission could grant permits for freeway-facing signs only if the signs are 'located upon or within five hundred (500) feet of the property upon which the use identified is located' and 'in the vicinity of a freeway interchange and within three hundred (300) feet of the freeway right-of-way and six hundred (600) feet of the intersecting street right-of-way.'" *Id.* (quoting sign ordinance). Moreover, the city officials granting the permits were required to make "specific findings" regarding the "proposed height in relation to the freeway elevation, the number and spacing of signs in the area, and the sign's height, design, and location in relation to its proposed use." *Id.* Finally, the sign ordinance at issue required any signs to be "'compatible with the style and character of existing improvements upon lots adjacent to the site,' including incorporating specific visual elements such as type of construction materials, color, or other design detail." *Id.*

The court in *Outdoor Media* concluded that these provisions provided sufficient guidance to eliminate the risk of unfettered discretion. First, the definition of "off-site" signs in the ordinance was "sufficiently clear to guide [the city official's] discretion, particularly when coupled with the additional restrictions governing freeway-facing signs." *Id.* The city official's discretion was also "cabined by specific

findings regarding the relationship of the sign to the site, the freeway, and other signs in the area." *Id.* at 904–05. Notably, the court concluded that, although the "design review criteria are 'somewhat elastic and require reasonable discretion to be exercised by the permitting authority, this alone does not make the Sign Code an unconstitutional prior restraint.'" *Id.* at 905 (quoting *G.K. Ltd. Travel,* 436 F.3d at 1083).

In *Desert Outdoor,* the plaintiffs challenged a sign ordinance that conditioned a permit on a finding that it "will not have a harmful effect upon the health or welfare of the general public and will not be detrimental to the welfare of the general public and will not be detrimental to the aesthetic quality of the community or the surrounding land uses." 103 F.3d at 817. Unlike *Outdoor Media,* the court in this case invalidated the ordinance because it gave officials unfettered discretion based on these "ambiguous and subjective reasons," because it contained "no limits on the authority of City officials to deny a permit," and because it allowed officials to deny an application "without offering any evidence to support the conclusion that a particular structure or sign is detrimental to the community." *Id.* at 818, 819.

Finally, in *G.K. Ltd. Travel,* the plaintiffs challenged a sign ordinance that required: "[S]igns must be compatible with other nearby signs, other elements of street and site furniture and with adjacent structures. Compatibility shall be determined by the relationships of the elements of form, proportion, scale, color, materials, surface treatment, overall sign size and the size and style of lettering." 436 F.3d at 1082 n. 15. The ordinance required processing of an application within 14 days and provided for appeal of a denial to the city council. *Id.* at 1083. Moreover, the ordinance provided that "[a]pproval or de-

nial of a [minor development permit] application shall be accompanied by written findings that explain the criteria and standards considered relevant to the decision, state the facts relied upon in rendering the decision and explain the justification for the decision based on the criteria, standards, and facts set forth." *Id.* (brackets in original).

Like *Outdoor Media,* the court in *G.K. Ltd. Travel* concluded that these facts sufficiently reigned in discretion so as to prevent any First Amendment violations. Specifically, the court reasoned that using "compatibility" as the standard for a permit denial was sufficiently definite because the term was defined in the ordinance and the ordinance contained specific factors upon which the city official could determine "compatibility," such as "form, proportion, scale, color, materials, surface treatment, overall sign size and the size and style of the lettering." *Id.* The court also reasoned that requiring prompt adjudication and requiring a specific statement of reasons for denial "ensures that the compatibility determination is properly limited in scope and allows the Sign Code to be 'enforceable on review.'" *Id.* (citing *Chicago Park Dist.,* 534 U.S. at 324, 122 S.Ct. 775).

■ As this Court concluded on two previous occasions, three considerations emerge from these cases to determine whether an ordinance confers unfettered discretion in violation of the First Amendment: (1) whether the ordinance contains "reasonably specific" criteria on which a denial may rest; (2) whether the ordinance outlines objective factors to consider in denying an application under the "reasonably specific" criteria; and (3) whether the ordinance requires officials to "state the reasons for his or her decision to either grant or deny a permit so as to facilitate

effective review of the official's determination," which allows the determination to be "enforceable on review." *See id.; Desert Outdoor,* 103 F.3d at 818–19.

Consistent with its ruling at the preliminary injunction stage, the Court concludes that the specific plan, supplemental use district, and development agreement exceptions contained in Sections 14.4.4(B)(9) and (11) fall much closer to the ordinance invalidated in *Desert Outdoor* than the ordinances upheld in *G.K. Ltd. Travel* and *Outdoor Media,* but that the relocation agreement exception in section 14.4.4(B)(11) does not grant the City unfettered discretion to deny signs based on content. The Court will discuss each of these exceptions in turn.

### 1. Specific Plans that Permit Off–Site and Supergraphic Signs

■ The City explains that it is required by state law to adopt a "general plan" that includes a land-use element that "designates the proposed general distribution and general location and extent of the uses of the land.... " Cal. Govt.Code §§ 65300, 65302. A "specific plan" is used to implement and refine a city's "general plan," but must also be consistent with the City's general plan. *See id.* § 65450; *De-Vita v. County of Napa,* 9 Cal.4th 763, 803, 38 Cal.Rptr.2d 699, 889 P.2d 1019 (1995). Specific plans are created by the City Council. Los Angeles City Charter § 558.[3]

The City first argued in opposition to Plaintiffs' preliminary injunction motion that a specific plan is not a permitting scheme, so Plaintiffs may not bring an unfettered discretion challenge. Yet the two cases the City cites for this proposition, *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 781–82, 108 S.Ct.

---

**3.** The Court previously took judicial notice of this document.

2138, 100 L.Ed.2d 771 (1988) (White, Stevens, O'Connor, JJ., dissenting) and *Get Outdoors II, LLC v. City of San Diego,* 506 F.3d 886, 894 (9th Cir.2007), do not support this conclusion. In both of those cases, the laws at issue *were* permitting schemes, so the Courts never needed to decide the question posed by the City here. In any event, there is no logical or legal reason to limit unfettered discretion challenges only to statutes that, on their face, are explicit permitting schemes. Unfettered discretion can come in many forms, but its hallmark is the grant of authority to approve or deny speech with a concomitant failure to adopt standards to cabin that authority to decisions based on factors other than the content of speech. *See City of Lakewood,* 486 U.S. at 759, 108 S.Ct. 2138 ("Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech."). To limit these challenges to pure licensing schemes would simply push cities and states to adopt creative measures that do not, on their face, look much like traditional permitting or licensing ordinances, but still grant officials unfettered discretion to allow or deny speech based on its content. As discussed below, this case is a perfect example of a non-traditional scheme that nevertheless creates broad unfettered discretion to limit speech based on content.

Without providing much detail, the City next argued that, because a specific plan must be legislatively adopted and applies only to specific geographic areas of the City, it passes First Amendment muster. The City again has missed the point of Plaintiffs' challenge. Whether the specific plans apply to any particular geographic area is largely irrelevant if the City can adopt a specific plan with no discernable standards to cabin the City's discretion. In other words, the City can avoid the blanket ban on off-site and supergraphic signs simply by enacting a specific plan in a certain area, but there are no standards that would prevent the City from enacting a specific plan because it wishes to approve particular speech or a particular speaker, or conversely, decline to enact a specific plan because it disagrees with particular speech or a particular speaker. This is the precise evil the prohibition on unfettered discretion was meant to prevent and the City has failed to demonstrate that this evil is absent here. *See id.*[4]

The City's analogy to *Outdoor Systems, Inc. v. City of Mesa,* 997 F.2d 604 (9th Cir.1993) is unavailing. That case involved a challenge to two sign ordinances, one of which imposed a blanket ban on all off-site signs and the other which restricted off-site signs in some parts of the City but not others. The City argued that this case supports its argument that a mere "geographic" restriction on off-site signs is valid. Even if that were true under *Outdoor Systems,* the City's specific plan exception goes far beyond a geographic limitation. True, a specific plan is defined by geographic boundaries, but nothing prevents the City from drawing those geographic boundaries so as to allow certain speech

---

4. The Court also previously rejected the City's specious argument that the exceptions to the off-site and supergraphic sign ban do not create the risk of self-censorship. The risk of self-censorship is *always* present in an ordinance that grants a municipality unfettered discretion. *See City of Lakewood,* 486 U.S. at 758, 108 S.Ct. 2138 (requiring objective standards for approving speech because they add "an element of certainty fatal to self-censorship."). In any event, this risk is primarily relevant to proving injury (and thus standing) to bring an unfettered discretion challenge without the municipality actually subjecting the plaintiff to the challenged law. Once the plaintiff can point to the risk of self-censorship, the relevant inquiry is whether objective standards exist to cabin unfettered discretion.

and speakers it favors and prohibit others it disfavors. The mere geographic limitation here does nothing to prevent the unfettered discretion that the First Amendment prohibits and *Outdoor Systems* did not address this specific question. Therefore, summary judgment is warranted in Plaintiffs' favor on this point.

2. *Supplemental Use Districts that Permit Off–Site and Supergraphic Signs*

Supplemental Use Districts ("SUDs") may only be created by the City Council and are designed to "regulate and restrict the location of certain types of uses whose requirements are difficult to anticipate and cannot adequately be provided for in the 'Comprehensive Zoning Plan.'" LAMC § 12.32 C, S1(a).[5] The type of SUD at issue here is called a "sign district." *Id.* § 12.32 S1(b). The LAMC imposes some restrictions on where these districts can be created:

(1) they may only be established where "high intensity uses" are permitted, which include "only properties in the C[commercial] or M [industrial] Zones, except that R5 [multiple dwelling] Zone properties may be included in a 'SN' sign district provided that the R5 zoned lot is located within an area designated on an adopted community plan as a 'Regional Center,' 'Regional Commercial,' or 'High Intensity Commercial,' or within any redevelopment project area"; and

(2) they may not "contain less than one block or three acres in area, whichever is the smaller."

*Id.* § 13.11B. The provision permitting the City to enact an SUD sign district provides that it must be "designed to enhance the theme or unique qualities of that district, or which eliminate blight through a sign reduction program." *Id.* § 13.11A. Most important:

The sign regulations shall enhance the character of the district by addressing the location, number, square footage, height, light illumination, hours of illumination, sign reduction program, duration of signs, design and types of signs permitted, as well as other characteristics, and can include murals, supergraphics, and other on-site and off-site signs.

*Id.* § 13.11C.

The City argued that this provision provides no discretion to grant or deny permission to erect signs within an SUD, but only the ability to create an SUD. According to the City, Plaintiffs should only challenge an SUD if it does not provide the appropriate objective criteria for allowing off-site and supergraphic signs. Again, the City misunderstands Plaintiffs' challenge. Certainly if Plaintiffs' signs are located within an SUD that does not provide the appropriate objective criteria for allowing signs, they may challenge it under the First Amendment. But here, Plaintiffs are challenging the lack of standards by which the City can create an SUD in the first place. Should the City wish to permit (or deny) the content of proposed signage or signs from a particular speaker, Plaintiffs argue that the SUD exception to the ban on off-site and supergraphic signs allows it to do so simply by enacting an SUD.

At first glance, the guidelines in subsection C appear to save this provision and provide the necessary objective criteria to cabin discretion in SUDs and sign districts. As in *Outdoor Media* and *G.K. Ltd. Travel,* these specific guidelines are sufficiently concrete to provide little leeway in permitting signs and they contain objective criteria to guide officials' permitting deci-

---

5. The Court previously took judicial notice of    this document.

sions. Most important, these guidelines are concrete enough that an official is compelled to provide a specific, content-neutral reason for a permit denial and a court can easily review that decision to determine if it was based upon the permissible criteria in subsection C or based upon impermissible content-based considerations.

While this might end the Court's inquiry, the City has provided itself a loophole that eviscerates the standards it has set out in this provision: "However, the regulations for a 'SN' Sign District cannot supersede the regulations of an Historic Preservation Overlay District, *a legally adopted specific plan,* supplemental use district or zoning regulation needed to implement the provisions of an approved development agreement." LAMC § 13.11C (emphasis added). In other words, even though the City may create a sign district, it may also eliminate that sign district (and its attendant permitting guidelines) simply by enacting a specific plan. The Court has invalidated the specific plan exception above, and this "exception to the exception" that can change a sign district into a district covered by a specific plan must also be invalidated. The City has set up a system that allows it to eliminate speech based on content, despite the objective criteria contained in the sign district provision, and it cannot stand. Therefore, Plaintiffs are entitled to summary judgment on this point.

### 3. *Development Agreement Exception*

As the specific plan exception goes, so goes the development agreement exception. A development agreement essentially freezes development laws at the time the agreement is executed. *See* Cal. Govt. Code § 65866 ("Unless otherwise provided by the development agreement, rules, regulations, and official policies governing permitted uses of the land, governing density, and governing design, improvement, and construction standards and specifica-

tions, applicable to development of the property subject to a development agreement, shall be those rules, regulations, and official policies in force at the time of execution of the agreement."). Notably, "[a] development agreement shall not be approved unless the legislative body finds that the provisions of the agreement are consistent with the general plan and any applicable specific plan." *Id.* § 65867.5(b).

The Court has invalidated the specific plan exception to the blanket off-site and supergraphic sign ban, and that provision takes down the development agreement exception with it. The specific plan legislative mechanism allows the City to enact a specific plan to allow or deny signs without objective criteria, and because a development agreement must be consistent with that specific plan, it too is not cabined by specific objective criteria to permit or deny signs.

The Court notes that, other than its contingency on a specific plan, this provision appears to be valid and unrelated to restricting speech. Plaintiffs argue that California Government Code section 65865.2 allows the City to restrict speech because the development agreement "may include conditions, terms, restrictions and requirements for subsequent discretionary actions." However, the Court finds Plaintiffs' concerns unlikely under this provision. This statute governs the terms of any agreement and the Court can presume that, under this provision, the City will not include terms that would allow it to restrict speech based on its content. Moreover, even though the statute allows the City to adopt restrictions for subsequent discretionary actions, a development agreement is still an agreement, subject to at least some negotiation, so any potential risk of the City reserving discretion to deny signs based on content will likely fail in that negotiation process. Other than

the express recognition of a potentially invalid specific plan, this development agreement exception to the ban on off-site and supergraphic signs is more properly subject to an as-applied challenge between the City and a signatory to the agreement. Plaintiffs have not mounted that challenge here. Therefore, although the provision is otherwise valid, Plaintiffs have nevertheless demonstrated a likelihood of success in their unfettered discretion challenge to this provision because the development agreement exception can be tied to the specific plan exception.

### 4. Relocation Agreement Exception for Off–Site Signs Under Section 14.4.4(B)(11)

Off-site signs are also exempt from the blanket ban pursuant to "a relocation agreement entered into pursuant to California Business and Professions Code Section 5412." LAMC § 14.4.4(B)(11). The Court previously concluded that Plaintiffs could not demonstrate a likelihood of success on the merits of this claim and ultimately dismissed this challenge with prejudice. Therefore, Plaintiffs are not entitled to summary judgment on this claim.

### 5. Interference with Legislative Prerogative

For the first time in opposition to summary judgment, the City argues that the Court's invalidation of these provisions violates separation of powers principles and impinges on the City's legislative prerogative to pass laws governing signage. The City relies on two cases to support its argument, neither of which persuades the Court to deviate from its prior ruling. See Associated Gen. Contractors of Amer. v. City of Columbus, 172 F.3d 411 (6th Cir. 1999); New Orleans Water Works Co. v. City of New Orleans, 164 U.S. 471, 17 S.Ct. 161, 41 L.Ed. 518 (1896). In both of these cases, the Courts rejected injunctions that purported to enjoin legislative bodies from passing future legislation. See Associated Gen. Contractors, 172 F.3d at 418 (citing New Orleans Water Works and stating: "The Supreme Court consistently has held that 'a court of equity cannot properly interfere with, or in advance restrain, the discretion of a municipal body while it is in the exercise of powers that are legislative in their character.'"). Here, the Court has not enjoined the City from enacting any new sign provisions. Rather, the Court has invalidated the exceptions adopted by the City that afford it unfettered discretion to decide when signs will be permitted pursuant to a specific plan. Consistent with Associated General Contractors and New Orleans Water Works, the Court certainly will not (and cannot) prevent the City from enacting legislative guidelines to address the constitutional infirmity of these exceptions, but the legislation, as it has been enacted, is unconstitutional.

### 6. Severability of the Exceptions in Sections 14.4.4(B)(9) and 14.4.4(B)(11)

After concluding at the preliminary injunction stage that the exceptions in section 14.4.4(B)(9) and three of the four exceptions in section 14.4.4(B)(11) were invalid, the Court ruled that those provisions were not severable from the rest of the sign ordinance. The Court finds that this is still the case. The Court must look to state law to determine whether a provision is severable. See Qwest Commc'ns, Inc. v. City of Berkeley, 433 F.3d 1253, 1259 (9th Cir.2006). "Under California law, the presence of a severability clause coupled with the ability functionally, mechanically, and grammatically to sever the invalid portion from the valid portions of an enactment ordinarily will allow severance but only if the remainder of the enactment is complete in itself and would have been

adopted without the invalid portion." *Id.* If the law contains a severability clause, the Court still must look to these factors. *See MHC Fin. Ltd. P'ship Two v. City of Santee,* 125 Cal.App.4th 1372, 1393, 23 Cal. Rptr.3d 622 (2005) ("When the ordinance contains a severability clause, an invalid provision is severable if it is grammatically, functionally, and volitionally separable."); *Metromedia, Inc. v. City of San Diego,* 32 Cal.3d 180, 190, 185 Cal.Rptr. 260, 649 P.2d 902 (1982) (*Metromedia II*) (stating that, even in light of a severability clause, "[t]he final [severability] determination depends on whether the remainder ... is complete in itself and would have been adopted by the legislative body had the latter forseen [sic] the partial invalidation of the statute ... or constitutes a completely operative expression of the legislative intent ... [and] are [not] so connected with the rest of the statute as to be inseparable." (internal citations omitted; ellipses and brackets in original)). If any one of these three requirements is not met, then the provision is not severable. *See, e.g., People v. Library One, Inc.,* 229 Cal.App.3d 973, 989, 280 Cal.Rptr. 400 (1991) (declining to address volitional severability because the invalid provision was not functionally severable). Plaintiffs contend that the invalid exceptions to the blanket off-site and supergraphic sign bans are not functionally and volitionally severable, and the Court agrees.[6]

■ A provision is functionally severable if the remaining provisions "stand on their own, unaided by the invalid provisions nor rendered vague by their absence nor inextricably connected to the [invalid provisions] by policy considerations." *Id.* The sign ordinance was enacted specifically to "promote public safety and welfare" by regulating the design and construction of signs, on the one hand, and "equalizing the opportunity for messages to be displayed" on the other. LAMC § 14.4.1. The detail of the sign ordinance itself suggests that the City sought to strike this balance between permitting commercial messages and preserving the safety and aesthetics of the City. Severing the exceptions in the ban on off-site and supergraphic signs would upset this policy balance that the City attempted to achieve and would, in effect, cause the Court to legislate a blanket ban that the City did not itself enact. *See Metromedia II,* 32 Cal.3d at 191, 185 Cal.Rptr. 260, 649 P.2d 902 (refusing to sever invalid billboard provisions because doing so would "leave the city with an ordinance different than it intended"). The City's interests lie in balancing the dissemination of messages against the preservation of safety and aesthetics, and severing the exceptions to these blanket bans would upset that balance.

Likewise, these exceptions are not volitionally severable because the City likely would not have enacted these blanket bans had it foreseen that their exceptions would be invalidated. *See Mendoza v. California,* 149 Cal.App.4th 1034, 1063, 57 Cal. Rptr.3d 505 (2007). While the City sought to ban off-site and supergraphic signs, it clearly did not intend for those bans to eliminate all of these signs. In fact, the City seems to have utilized the exceptions to these bans numerous times and in numerous areas to generate revenue for the City, probably reaching into the millions of dollars. Invalidating these exceptions but not the blanket bans would, with a stroke of the Court's pen, eliminate these revenue streams. Nothing in the sign ordinance suggests that the City would have imposed blanket bans, although permitted, *see Out-*

---

6. The parties agree that the exceptions are grammatically severable because they "can be cleanly excised from the remainder of the statute without affecting the wording of any other provision." *National Broiler Council v. Voss,* 44 F.3d 740, 749 (9th Cir.1994).

*door Systems,* 997 F.2d at 611, at the expense of its ability to allow some signs and not others.

The City also sent only a weak legislative signal that these exceptions may be severed by enacting a mere general severability clause. *See* LAMC § 11.00(k). As Plaintiffs correctly point out, despite this provision, the City has routinely tacked on specific severability clauses to individual code provisions. *See, e.g.,* LAMC § 12.70(F) (Adult Entertainment Zoning); § 16.05(J) (Site Plan Review); § 41.23.6 (Trespass on Housing Authority Property). Given the clear legislative intent to strike a balance between permitted and prohibited signage, the Court can presume that the City would have specifically enacted a severability clause somewhere in the sign ordinance as it did elsewhere if it harbored a desire to enact the blanket bans absent their exceptions. *Cf. Sanford v. Memberworks, Inc.,* 483 F.3d 956, 965 (9th Cir. 2007) ("Where Congress includes particular language in one section of a statute but omits it in another ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Severing the invalid exceptions here is particularly inappropriate because it would effectively require "the State to restrict *more* speech than it currently does." *Rappa v. New Castle Cty.,* 18 F.3d 1043, 1072–73 (3d Cir.1994) (emphasis in original). In *Rappa,* the court found invalid several exceptions to a ban on commercial signs within 25 feet of any public highway, but declined to sever those provisions from the blanket ban because the net effect would restrict more speech than the county had originally intended. The court noted that the severability question had a "constitutional dimension": "We refuse to strike down the exception in part because of the

special status of speech in our constitutional scheme, a scheme which generally favors more speech." *Id.* at 1073. The court also recognized the disincentives created by severing the invalid exceptions because, even if a litigant successfully challenges those invalid exceptions, it still would be unable to erect signs under the remaining blanket ban. *Id.* Notably, the court refused to cause such a result absent a much clearer legislative signal than a mere general severability clause (much like the one enacted by the City here). *Id.*

The City advances only one additional point on severability in opposition to summary judgment: because the Court was primarily concerned with the specific plan exemption, that provision can be severed and the sign district and development agreement exceptions, along with the rest of the sign ordinance, may remain in place. However, as discussed above, the specific plan exemption is so integrated into the fabric of the sign ordinance that the Court cannot extricate it without undermining the entire scheme. Perhaps this is best illustrated by the City's own contention that the sign district and development agreement exemptions themselves incorporate and rely on the specific plan provision. To sever the specific plan exception would legislate new meaning into the sign ordinance, a step the Court will not take. As it did at the preliminary injunction stage, the Court concludes that the exceptions in section 14.4.4(9) and three of the four exceptions in section 14.4.4(11) are not severable from the blanket ban on off-site and supergraphic signs, so those entire provisions must be invalidated and enjoined.[7]

## B. *Plaintiffs' Central Hudson Challenge to Section 14.4.6*

■ Plaintiffs also seek summary judgment on their challenge to the section

---

7. The Court previously dismissed Plaintiffs' challenge to the relocation agreement excep-

tion in section 14.4.4(B)(11) so the Court will not enjoin enforcement of that provision.

14.4.6 Freeway Exposure provision as an impermissible restriction on commercial speech under *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) ("*Central Hudson*"). The Court previously ruled that Plaintiffs had demonstrated a likelihood of prevailing on this claim, and the Court now finds that they are entitled to summary judgment on this claim.

The Supreme Court's *Central Hudson* case set out the four-part test for regulating commercial speech: (1) whether the speech concerns lawful activity and is not misleading; (2) whether the restriction seeks to implement a substantial government interest; (3) whether the restriction directly advances that interest; and (4) whether the restriction reaches no further than necessary to accomplish the government's stated objectives. 447 U.S. at 566, 100 S.Ct. 2343. The City's stated interests in the Freeway Exposure provision are safety and aesthetics, which Plaintiffs do not challenge. Nor does the City argue that Plaintiffs' signs concern unlawful activity or are misleading. Rather, the parties dispute the last two prongs of the *Central Hudson* test.[8]

The City's Freeway Exposure provision must have "a reasonable fit between the restriction and the goal" and must "include a means narrowly tailored to achieve the desired objective." *Ballen v. City of Redmond*, 466 F.3d 736, 742 (9th Cir.2006) (citations and quotations omitted). However, "[a] regulation need not be absolutely the least severe that will achieve the desired end, but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the fit between ends and means is reasonable." *Id.* (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n. 13, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)). Plaintiffs argue that, despite the prohibition on commercial signs within 2,000 feet of a freeway, the City routinely exempts some commercial signs from this restriction while permitting others, which violates the *Central Hudson* test.

Plaintiffs rely on *Ballen*, where the court invalidated a ban on portable and off-site signs under *Central Hudson* in part because the prohibition facially exempted certain other commercial signs from that prohibition. The *Ballen* court relied on *Discovery Network*, where the Supreme Court invalidated a law that prohibited all commercial news racks but allowed non-commercial news racks. The Court found that this selective ban created a distinction that had "no relationship *whatsoever* to the particular interests that the city has asserted" in safety and aesthetics. *Discovery Network*, 507 U.S. at 424, 113 S.Ct. 1505 (emphasis in original). The court in *Ballen* then focused on the several exceptions to the ban on off-site signs to conclude that those permitted signs posed no less of a traffic and safety hazard that the other signs banned under the ordinance. 466 F.3d at 743. The court also found the exceptions impermissibly content-based, which further undercut the or-

**8.** The City argues for the first time that, although Plaintiffs maintain signs within 2000 feet of a main traveled roadway, Plaintiffs have presented insufficient evidence to suggest that their signs will also be "primarily viewed from a main traveled roadway" as required by section 14.4.6. Put to its proof, Plaintiffs, in their reply, have provided testimony and photographs conclusively establishing that they have signs that fall within section 14.4.6. The City has provided no contrary evidence to create a factual dispute. In any event, the Court finds it highly implausible that Plaintiffs' signage, which is commercial in nature, would not be situated to be viewed primarily from a main traveled roadway, since that positioning maximizes sign exposure.

dinance's narrow tailoring. *See id.* at 743; *Discovery Network*, 507 U.S. at 417, 113 S.Ct. 1505 (stating that, by enacting a content-based restriction, the city had "not carefully calculated the costs and benefits associated with the burden on speech imposed by its prohibition.").

The City relies on *Outdoor Systems, Inc. v. City of Mesa*, 997 F.2d 604 (9th Cir.1993) to argue that the Freeway Exposure provision is a valid blanket ban of off-site and supergraphic signs within 2,000 feet of a freeway. In that case, the plaintiffs challenged two ordinances, one in Tucson that classified signs as either on-site or off-site, limited the size and number of on-site signs, and limited off-site signs primarily to commercial and industrial areas and within certain zoning classifications of the city. *Id.* at 608. The plaintiffs also challenged an ordinance in the city of Mesa that distinguished between on-site and off-site signs and prohibited off-site signs entirely. *Id.* at 608. The Ninth Circuit upheld the Tucson ordinance because it limited regulation of off-site signs to the "noncommunicative aspects" of those signs and upheld both ordinances, despite certain exemptions, because it "does not follow from the fact that the [cities] have concluded that some commercial interests outweigh [their] municipal interests ... that [they] must give similar weight to all other commercial advertising." *Id.* at 611 (quoting *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 512, 541, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion; Stevens, J., joining on this point)). Most important, the court found these ordinances reasonably fit with the cities' traffic safety and aesthetics concerns because "the cities have stopped short of achieving their goals because they have not banned outdoor signs entirely." *Id.* (citing *Metromedia*, 453 U.S. at 508, 101 S.Ct. 2882).

Neither *Ballen* nor *Outdoor Systems* quite answers the question posed by Plaintiffs, however. Here, Plaintiffs are not challenging the Freeway Exposure sign as facially discriminating against commercial messages, the primary issue in *Ballen* and *Outdoor Systems*. Rather, Plaintiffs here claim that the way in which the City has *applied* the Freeway Exposure ban discriminates against certain commercial speech and speakers, some of which the City has approved and some of which the City has prohibited. *See Desert Outdoor v. City of Oakland*, 506 F.3d 798, 805 (9th Cir.2007) (noting that an as-applied challenge involves "*discriminatory enforcement* of a speech restriction [that] amounts to viewpoint discrimination in violation of the First Amendment. It is for this reason that a successful as-applied challenge does not render the law itself invalid, but only the particular application of the law. An as-applied challenge goes to the nature of the application rather than the nature of the law itself.").

For this as-applied challenge, Plaintiffs properly rely on *Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999), where the Supreme Court invalidated commercial speech regulations that the government justified by pointing to specific interests even though those interests were directly undermined by other governmental policies. In that case, the FCC had banned advertising featuring privately owned commercial casino gambling. *Id.* at 180, 119 S.Ct. 1923. The FCC refused to permit New Orleans broadcasters to run private gambling advertising because the broadcast signals could reach into states where gambling was prohibited and undermined the government's interest in preventing the spread of casino gambling and the social costs attached to these activities. *Id.* The Court ultimately invalidated this ban because it did not reason-

ably fit the government's interests. *Id.* at 189. The government maintained a clear policy of giving "simultaneous encouragement of tribal casino gambling," which worked directly at cross purposes with its stated interest in preventing the spread of gambling and the attendant societal ills. *Id.* "[A]ny measure of the effectiveness of the Government's attempt to minimize the social costs of gambling cannot ignore Congress' simultaneous encouragement of tribal casino gambling, which may well be growing at a rate exceeding any increase in gambling or compulsive gambling that private casino advertising could produce." *Id.* Absent a reasonable fit between the government's ban and its stated interests, the commercial speech ban did not survive the application of *Central Hudson.* *Id.* at 195, 119 S.Ct. 1923.

The district court in *Metro Lights, LLC v. City of Los Angeles,* 488 F.Supp.2d 927 (C.D.Cal.2006) applied this "cross purposes" principle to invalidate the City's ban on newly constructed off-site signs for the purposes of safety and aesthetics, since the City simultaneously allowed thousands of off-site signs under an exclusive contract with a single speaker. *Id.* at 943. The court relied on *Greater New Orleans* to conclude that "[t]he City, on the one hand, enacted the Sign Ordinance for the express purpose of promoting traffic safety and eliminating visual clutter, while, on the other hand, awarded a large contract that permits its contractor to do precisely what its Ordinance prohibits. In short, the two operate at cross purposes." *Id.* at 945. This met neither *Central Hudson's* third prong of advancing the City's interests nor the fourth prong of reasonable fit. *Id.* at 947–50.

Like the plaintiffs in *Greater New Orleans* and *Metro Lights,* Plaintiffs here have persuasively demonstrated that, de-spite the City's interests in safety and aesthetics that support its ban on signs within 2,000 feet of a freeway, the City has permitted giant commercial billboards in these areas that directly undermine those interests. Plaintiffs point to five specific examples: an electronic sign near Staples Center; billboards in the 15th Street Signage Supplemental Use District; a 10,000 square foot supergraphic sign at 939 S. Figueroa Street; the "Freeway Overture" sign, depicting members of the Los Angeles Chamber Orchestra; and a sign at 1100 Wilshire Boulevard. The first two examples directly support Plaintiffs' argument, which is sufficient to demonstrate a First Amendment violation.

The electronic pole sign at the Staples Center changes messages frequently and can easily be seen from both directions of the 110 Harbor Freeway. This sign was permitted 10 years ago pursuant to an ordinance that required, in exchange for the signs permitted, that the applicant remove "nine (9) off-site signs and approximately forty (40) additional on-site signs", resulting in fewer signs at that location. However, the Freeway Exposure provision was in force at that time, and this ordinance permitting the Staples center sign exempted this specific land owner from its prohibition. This is precisely the First Amendment evil both *Greater New Orleans* and *Metro Lights* prohibited. Plaintiffs submitted an expert declaration from a traffic engineer that makes clear what is already common sense: electronic signage, with its changing messages, can create traffic hazards. (Declaration of William Kunzman ¶ 2, Ex. B.)[9] *See Metro Lights,* 488 F.Supp.2d at 944 (discussing Mr. Kunzman's experience and opinions, but noting that "this evidence is not necessary to the Court's ruling since [Mr. Kunzman's

---

9. Mr. Kunzman is a registered professional traffic safety engineer in California with 30 years of experience in the area. (Kunzman Decl. ¶ 2, Ex. A.)

traffic hazard] study tends to confirm what common sense suggests," i.e., that "[i]f a sign is in the field of vision of a driver ... it will have the potential of distracting the driver from his or her primary task of safely operating the vehicle."). That erecting this sign might also reduce the number of other signs in and around the Staples Center is irrelevant; the City does not indicate whether these removed signs were within 2,000 feet of the 110 freeway and, in any event, preserving even one freeway-facing sign still undermines the City's stated interests in traffic safety and aesthetics.

The billboards in the 15th Street Signage Supplemental Use District suffer from a similar flaw. The City argues that this SUD was created pursuant to a relocation agreement entered pursuant to California Business and Professions Code section 5412 and that it results in the reduction of 16 billboards along Santa Monica Boulevard in exchange for four billboards permitted in the SUD. The Court cannot determine whether this reduction generally furthered the City's interests in traffic safety and aesthetics because the City has failed to indicate where the other 16 billboards were located. If they did not fall within the Freeway Exposure ban, the Court can see little advancement of traffic safety by removing those 16 (which did not implicate freeway traffic safety) and erecting four billboards that now face a freeway. Again, even so, the signs facing the freeway directly undermine the City's stated concerns of traffic safety and aesthetics.

Plaintiffs also point to a gigantic 10,000 square foot commercial sign at 939 S. Figueroa Street, which is located within 2,000 feet of the 110 freeway. The City explains in opposition to summary judgment that this sign was permitted at a time when the ban on commercial signs near roadway extended only 500 feet. Even if this sign were permissible under prior versions of the sign ordinance, the other sites above sufficiently undermine the City's interests in aesthetics and safety that section 14.4.6 must fail.[10] Plaintiffs are entitled to summary judgment on this claim.

## IV. CONCLUSION

Plaintiffs have demonstrated that no genuine issues of material fact exist on their remaining claims, so the Court GRANTS summary judgment in their favor and ENJOINS the City based upon the terms found in the concurrently issued Judgment and Permanent Injunction. Plaintiffs have agreed to waive any remaining claims not subject to this Order and are not pursuing any claims for damages. Therefore, this case is finally adjudicated and should be closed, subject only to the Court retaining jurisdiction to enforce the terms of this Order.

**IT IS SO ORDERED.**

### AMENDED JUDGMENT AND PERMANENT INJUNCTION

On August 19, 2008, the Court granted Plaintiff World Wide Rush, LLC and Insite Outdoor Works LA, LLC's ("Plaintiffs") Motion for Summary Judgment in its entirety. Plaintiffs have advised the Court that, upon issuance of a permanent injunction, Plaintiffs will waive their claim for damages and all non-first-amendment

---

**10.** The City argues that the "Harbor Freeway Overture" mural is not a commercial sign and not subject to the same Freeway Exposure ban on commercial speech. The Court need not decide this question because, even absent this sign, Plaintiffs have demonstrated that other exceptions undermine the Freeway Exposure provision. The Court finds that Plaintiffs' arguments regarding 1100 Wilshire Boulevard are irrelevant because the signs in that location were erected in 1997 and 1998, and have long since been removed.

claims (subject to reinstatement should the preliminary injunction be reversed on appeal), and this injunction will constitute the Final Judgment in this action. After considering the evidence presented and the arguments of the parties, the Court rules as follows:

1. Sections 14.4.4(B)(9) and 14.4.4(B)(11) of the Sign Ordinance violate the First Amendment because the exceptions in those provisions for off-site and supergraphic signs permitted pursuant to special plans, supplemental use districts, and development agreements vest unfettered discretion in City officials.

2. The exceptions in sections 14.4.4(B)(9) and 14.4.4(B)(11) for off-site and supergraphic signs permitted pursuant to special plans, supplemental use districts, and development agreements are not severable.

3. The restriction in section 14.4.6 on signs within 2,000 feet of a freeway violates the First Amendment because it does not directly advance the City's asserted interests underlying the restriction and is not narrowly tailored to achieve those interests; therefore, section 14.4.6 is an unconstitutional restriction on commercial speech under *Central Hudson.*

Based on the foregoing, the Court ORDERS that:

1. Plaintiffs' Motion for Summary Judgment is GRANTED.

2. The City, its officers, agents, servants, employees and attorneys, and all those acting in concert or participating with them, are hereby permanently enjoined from taking the following actions against supergraphic signs owned and operated by Plaintiffs or those in contractual privity with them at the 19 sites specified in the modified preliminary injunction:

    a. Enforcing section 14.4.4(B)(9) of the sign ordinance;

    b. Enforcing section 14.4.4(B)(11) of the sign ordinance;

    c. Enforcing section 14.4.6 of the sign ordinance.

The sites subject to this injunction are as follows:

1. 3280 Cahuenga Blvd., Los Angeles, CA 90068

2. 6200 Wilshire Blvd., Los Angeles, CA 90048

3. 1606 Cotner Ave., Los Angeles, CA 90025

4. 165 N. La Brea Ave., Los Angeles, CA 90036

5. 5150 Wilshire Blvd., Los Angeles, CA 90036

6. 10680 W. Pico Blvd., Los Angeles, CA 90064

7. 1357 Highland Ave., Los Angeles, CA 90038

8. 1551 N. La Brea Ave., Los Angeles, CA 90046

9. 8200 Wilshire Blvd., Los Angeles, CA 90211

10. 8455 Beverly Blvd., Los Angeles, CA 90048

11. 1816, 1818, 1819 Oak St., Los Angeles, CA 90015

12. 1640 Marengo St., Los Angeles, CA 90033

13. 1651 S. Central Ave., Los Angeles, CA 90034

14. 8801 W. Pico Blvd., Los Angeles, CA 90035

15. 11022 Santa Monica Blvd., Los Angeles, CA 90025

16. 10801 National Blvd., Los Angeles, CA 90064

17. 3415 S. Sepulveda Blvd., Los Angeles, CA 90034

18.  6081 Center Dr., Los Angeles, CA 90045

19.  7901 Melrose Ave., Los Angeles, CA 90046

This injunction prohibits the City both from interfering with Plaintiffs' maintenance of their off-site signs and supergraphic signs and from issuing citations to Plaintiffs or those with whom they contract based on the above-cited code sections or based on the inability of Plaintiffs to obtain permits for their off-site signs and supergraphic signs because of the City's enforcement of the above-cited code sections. The City may inspect and verify Plaintiffs' signs to ensure that they have been constructed according to applicable code provisions to ensure the safe construction of signs.

The Court further ORDERS that there being no claims left to litigate in this action, that this judgment is the final judgment in this action.

**IT IS SO ORDERED.**