**WORLD WIDE RUSH LLC et al., Jamison 1055 Wilshire LLC et al., Sky Tag, Inc. et al., Cmty. Redevelopment Ass'n LLC, Figueroa Project 2 LLC, Figueroa Project 2 LLC, Plaintiffs,**

v.

**The CITY OF LOS ANGELES, Defendant.**

Nos. CV 07–00238 ABC (JWJx), CV 08–04762 ABC (JWJx), CV 08–05434 ABC (JWJx), CV 08–07584 ABC (JWJx), CV 08–05066 ABC (JWJx), CV 08–08508 ABC (JWJx).

United States District Court, C.D. California, Western Division.

March 18, 2009.

Michael C. Small, Rex S. Heinke, Akin Gump Strauss Hauer & Feld, Los Angeles, CA, Paul E. Fisher, Paul E. Fisher Law Office, Amy A. Hoff, Gary S. Mobley, Case Knowlson Jordan & Wright, Newport Beach, CA, Matthew C. Klase, Webb Klase and Lemond LLC, Atlanta, GA, Ryan D. Lapidus, Lapidus and Lapidus PLC, Beverly Hills, CA, for Plaintiffs.

Kenneth T. Fong, Rockard J. Delgadillo, Kim Rodgers Westhoff, Steven N. Blau, Los Angeles City Attorney's Office, Michael J. Bostrom, Deputy City Attorney, Colleen M. Courtney, Tayo A. Popoola, Office of the City Attorney, Los Angeles, CA, for Defendant.

## ORDER RE: BILLBOARDS

AUDREY B. COLLINS, Chief Judge.

### I. INTRODUCTION

The Court has before it numerous related cases concerning billboards and their modern equivalents, "Supergraphic Signs." These "Billboard Cases" all concern challenges to the City of Los Angeles's laws regulating the use and construction of Supergraphic Signs, enormously large advertisements, usually on a type of vinyl, that are stretched or pasted across the side of a building. They are hard to miss. Super-

graphics often span the width of a building and cover over ten floors. These signs are almost always "Off–Site" signs, meaning that the products they advertise are not available at the location where the sign is posted.

The City regulates these Supergraphic Signs through the Los Angeles Municipal Code ("Code"). Initially, the Code contained provisions that outright prohibited Off–Site Signs, in Code § 14.4.4.B.9, and Supergraphic Signs, in Code § 14.4.4.B.11. However, those sections also contained exceptions. A Supergraphic or Off–Site Sign was permissible if the City authorized it via a "specific plan," a "supplemental use district," or a "development agreement." Accordingly, when a company applied for a sign permit for a Supergraphic Sign—as required by the Code—the permit would be denied unless the sign fell within one of the exceptions.

Two billboard companies, World Wide Rush LLC and Insite Outdoor Works LA LLC, challenged the constitutionality of those code sections in *World Wide Rush LLC et al. v. City of Los Angeles*, 579 F.Supp.2d 1311 (C.D.Cal.2008). They brought a facial unfettered discretion challenge and this Court found both §§ 14.4.4.B.9 and B.11 unconstitutional in what is referred to herein as the "World Wide Rush Order." That order, issued on August 20, 2008, found that the exceptions to the Supergraphic Sign ban and Off–Site Sign ban gave City officials too much discretion in deciding whether or not to allow signage. This "unfettered discretion" raised free speech concerns under the First Amendment, the principle being that if a decision maker has too much discretion, that decision maker could prohibit—or allow—signs based solely on whether the decision maker agreed with the message presented. The First Amendment generally does not condone a municipality regulating speech based on content.

This Court then issued an injunction, the "World Wide Rush Injunction," which prohibited the City from enforcing §§ 14.4.4.B.9 and B.11 against the plaintiffs in the World Wide Rush action. Not long thereafter, numerous billboard companies began putting Supergraphic Signs up all over Los Angeles. These companies presumably thought that the World Wide Rush Order meant that they did not need to apply for permits. They were wrong. However, in retrospect, it did not seem to matter whether the companies applied or not. Of those companies that applied for permits, the permit applications were routinely rejected—directly and indirectly—under the auspices of §§ 14.4.4.B.9 and B.11, even though this Court found those sections unconstitutional.

As a result, well-traveled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs. The City, in turn, began to issue citations as to the signs, claiming that they violated various Code sections. Ironically, these citations often claimed that the signs lacked permits—despite the City's wrongful refusal to accept the permit applications in the first instance. However, the citations also raised serious fire and life safety concerns. When the billboard companies received citations, they brought lawsuits—the Billboard Cases—against the City before this and other Courts. The billboard companies cried foul in that the City, they argued, should not be allowed to issue any citations in light of the World Wide Rush Order. Billboard companies maintained this position even though they often failed to seek a permit in the first instance, or erected their signs after an Interim Control Ordinance went into effect. The Interim Control Ordinance, enacted by the City in December 2008, again, prohibits Supergraphic Signs, but does so without relying on the provi-

sions found unconstitutional by this Court. Under this ordinance, no Supergraphic Signs were allowed after December 26, 2008.

At present, the Court has before it seven motions in six cases. The plaintiffs in *World Wide Rush LLC et al. v. City of Los Angeles*, CV 07–00238, ("WWR Plaintiffs") ask the Court to enforce the injunction granted in that case. The plaintiffs in *Jamison 1055 Wilshire LLC et al. v. City of Los Angeles*, CV 08–04762 and in *Sky Tag, Inc. et al. v. City of Los Angeles*, CV 08–05434, ("Jamison–Sky Tag Plaintiffs") ask the Court to issue a preliminary injunction based on the World Wide Rush Order. The plaintiff in *Community Redevelopment Ass'n LLC v. City of Los Angeles*, CV 08–07584, asks the Court to amend an injunction that was based on the World Wide Rush Order that was previously granted in that action. Concomitantly, the City has brought a cross-motion in that action asking the Court to reconsider the injunction. In two other matters, both brought by the same plaintiff, *Figueroa Project 2 LLC v. City of Los Angeles*, CV 08–05066 and *Figueroa Project 2 LLC v. City of Los Angeles*, CV 08–08508, the plaintiff asks the Court to stay each action.

This order addresses all of these motions. The first, and longest, section below sets forth and analyzes the relevant Code provisions, as well as the City's procedures in permitting and policing Supergraphic Signs. The following sections address the motions brought by the parties. Section III addresses World Wide Rush. Section IV analyzes the motions brought by the Jamison–Sky Tag Plaintiffs. Section V discusses the cross-motions in *Community Redevelopment Agency* and Section VI covers the stay requested in the two *Figueroa* cases. The Court hopes that, after reviewing the analyses herein, the parties will have a better appreciation as to the posture of their cases, and the most appropriate course of action going forward. The parties on both sides of this dispute have too often proceeded recklessly, displaying a lack of judgment the Court would not expect from either the City, or those with whom it does business.[1]

## II. SIGNS IN THE CITY OF LOS ANGELES [2]

### A. SIGN REGULATIONS

The Los Angeles Municipal Code ("Code") regulates signs, in part, through

---

**1.** Because this single order covers seven motions in six different cases, the Court prefaces every evidentiary citation with a truncated version of the case name or number. Accordingly, when the Court cites to evidence submitted in *World Wide Rush* the Court will cite: (WWR Doe Decl. ¶ 1). Or, when citing to the *Community Redevelopment Association* action, the Court cites: (CRA Doe Decl. ¶ 2.) In the *Jamison* and *Sky Tag* actions, the plaintiffs are affiliated with one another. The plaintiffs in Sky Tag are "engaged in the business of erecting and maintaining" billboards while the Jamison plaintiffs "are owners of commercial properties in the City of Los Angeles who have contracted with the Sky Tag Plaintiffs for the placement of" billboards. (Jamison McNeilly Ex Parte Decl. (Docket No. 48) ¶¶ 1–2.) The Jamison–Sky Tag Plaintiffs are represented by the same counsel and the parties

filed the same papers for each matter. Accordingly, for ease of reference, the Court will cite the papers, and docket numbers, from the first-filed *Jamison* action (CV 08–04762), and cite them as: (Jamison Doe Decl. ¶ 3).

**2.** This section cites to evidence submitted with the parties' various motions. However, the Court has been careful to limit determination of each motion to the evidence presented in conjunction with that matter. This "limitation" however, has not altered the Court's overall view of the effect and construction of the City's regulations, or the City's general adherence—or lack thereof—to the relevant regulations. This is due in large part to the fact that in each case the City has presented, more or less, the same facts, though not always through the same means. (*Compare*,

Chapter I, Article 4.4 "Sign Regulations." [3]

## 1. SECTION 14.4.2 SIGN DEFINITIONS

The Code defines a sign and its various iterations as follows:

"Sign. Any whole or part of a display board, wall, screen or object, used to announce, declare, demonstrate, display or otherwise present a message and attract the attention of the public."

"Off–Site Sign. A sign that displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where the sign is located."

"Supergraphic Sign. A sign, consisting of an image projected onto a wall or printed on vinyl, mesh or other material with or without written text, supported and attached to a wall by an adhesive and/or by using stranded cable and eyebolts and/or other materials or methods, and which does not comply with the following provisions of this Code: Sections 14.4.10; 14.4.16, 14.4.17; 14.4.18; and/or 14.4.20." [4]

"Temporary Sign. Any sign that is to be maintained for a limited duration, not to exceed 30 days, including paper signs and other signs that are not permanently affixed to the ground or building."

"Wall Sign. Any sign attached to, painted on or erected against the wall of a building or structure, with the exposed face of the sign in a plane approximately parallel to the plane of the wall."

Code § 14.4.2 ("The following terms shall apply to this article. Other terms used in this article shall have the meanings set forth in Section 12.03 of this Code, if defined in that section.").

## 2. SECTION 14.4.4.B.9 SUPERGRAPHIC SIGNS PROHIBITION/EXCEPTIONS

Under Code § 14.4.4.B.9 Supergraphic Signs are prohibited "except when supergraphic signs are specifically permitted pursuant to a legally adopted specific plan, supplemental use district or an approved development agreement." Code § 14.4.4.B.9.

## 3. SECTION 14.4.4.B.11 OFF–SITE SIGNS PROHIBITION/EXCEPTIONS

Under Code § 14.4.4.B.11, Off–Site Signs are prohibited "except when off-site signs are specifically permitted pursuant to a legally adopted specific plan, supplemental use district, an approved development agreement, or a relocation agreement entered into pursuant to California Business and Professions Code Section 5412. This prohibition shall also apply to alterations or enlargements of legally existing off-site signs." Code § 14.4.4.B.11.

---

e.g., WWR Fasmer Declarations to Jamison Molina Declarations.)

**3.** The website for the City of Los Angeles contains a link for the Municipal Code which is directed to the Code as published on the internet by the American Legal Publishing Corporation. (See City of Los Angeles Website (follow "City Charter, Rules & Codes" hyperlink; then follow hyperlink for "Municipal Code" (linked to www.amlegal.com/

library/ca/losangeles.shtml.).)) The Code, as published by the American Legal Publishing Corporation, was the source of the Court's Code citations, unless otherwise noted.

**4.** Section 14.4.10 governs Wall Signs, §§ 14.4.16 and 14.4.17 govern Temporary Signs, § 14.4.18 governs Off–Site Signs and § 14.4.20 governs mural signs. See Code Article 4.4.

### 4. SECTION 14.4.10 WALL SIGNS

Code § 14.4.10 governs Wall Signs and puts various restrictions on the use of these signs. It is important to note the difference between the definition of a Wall Sign, and the restrictions imposed on those signs; the definition, set forth in § 14.4.2, is not the same as the restrictions, set forth in § 14.4.10. That is to say, § 14.4.2 describes what constitutes a Wall Sign, while § 14.4.10 instructs as to its use.

Among the restrictions on Wall Signs are various surface area requirements which are tied to the amount of Street Frontage and Building Frontage.[5] Code § 14.4.10(A). Street Frontage refers to "[t]he length of a line separating a lot from one street." Code § 14.4.2 (defining "Street Frontage"). Building Frontage refers to "[t]he projection of the building walls upon the street used for street frontage." Code § 14.4.2 (defining "Building Frontage"). Accordingly, unless a building takes up the entire length of a lot along a street, Building Frontage will generally be less than Street Frontage as Building Frontage refers to the length of the building facing the street while Street Frontage refers to the length of the lot, on which the building sits, facing the street. How large a Wall Sign can be depends on the Street and Building Frontage. The point being: in order to fall within § 14.4.10, the sign must be limited in size.[6]

Based on the definitions of a Wall Sign and a Supergraphic Sign, a sign on a wall "with the exposed face [ ] in a plane approximately parallel to the plane of the wall" that consists "of an image [ ] printed on vinyl, mesh or other material with or without written text, supported and attached to a wall by an adhesive and/or by using stranded cable and eye-bolts and/or other materials or methods" but that **complies** with the requirements of Code § 14.4.10 would be regulated as a Wall Sign that is NOT a Supergraphic Sign.

However, a "sign attached to [ ] the wall of a building or structure, with the exposed face of the sign in a plane approximately parallel to the plane of the wall" that consists "of an image projected onto a wall or printed on vinyl, mesh or other material with or without written text, supported and attached to a wall by an adhesive and/or by using stranded cable and eye-bolts and/or other materials or methods"

5. An additional requirement is that any Wall Sign over 100 feet above ground level "is limited to a company logo, generic type of business, or the name of a business or building." Code §§ 14.4.10.E ("Any wall signs located over 100 feet above grade shall be used as identification signs only."), 14.4.2 (defining "Identification Sign").

6. For example, to determine the maximum size allowed for a Wall Sign on a multi-story building, it appears that one is initially allowed two square feet for each foot of street frontage. *See* 14.4.10.A.1. One is also allowed an additional square foot for each foot of building frontage. *See* 14.4.10.A.1. The Court will refer to the total square feet calculated by adding the two square feet per foot of street frontage and the one square foot per building frontage as the "Single Story Allowance." The maximum allowance for a multi story building is one and one-half of the Single Story Allowance. This one and one-half calculation further presumes the building is at least five stories in addition to the initial story. Code § 14.4.10.A.2 ("For buildings more than one story in height, the combined wall sign area shall not exceed that permitted for a single story by more than ten percent for each additional story. In no event, shall the combined wall sign area exceed by 50 percent that area permitted for a single-story building.") Because the parties do not brief calculations for size requirements, and because the Code contains various cross-referenced sections, some of which may have escaped the Court's notice, the Court is not making any specific findings as to the proper method of calculating size. The illustration above is simply meant to convey a sense of the restrictions on Wall Signs under § 14.4.10.

that **does NOT** comply with the requirements of Code § 14.4.10 is not governed by § 14.4.10 despite the fact that it fits both the definition of a Wall Sign and the definition of a Supergraphic Sign.

Section 14.4.10 contains additional restrictions relating to, among other things, location and projection, that do not seem particularly relevant here.[7] *See, e.g.,* Code § 14.4.10.C and D.

### 5. SECTION 14.4.16 TEMPORARY SIGN RESTRICTIONS

Code § 14.4.16 governs Temporary Signs. Temporary Signs, under § 14.4.16 have a size restriction. Code § 14.4.16.B ("The combined sign area of temporary signs shall not exceed two square feet for each foot of street frontage."). In addition, Temporary Signs "shall be removed within 30 days of installation and shall not be reinstalled for a period of 30 days of the date of removal of the previous sign. The installation of temporary signs shall not exceed a total of 90 days in any calendar year." Code § 14.4.16.C.[8]

### B. ZONING REGULATIONS, SECTION 12.21.A.1.(a)

Chapter I, Article 2 of the Code relates to a comprehensive zoning plan. Section 12.21.A.1.(a) states:

"**Permits and Licenses.** No building or structure shall be erected, reconstructed, structurally altered, enlarged, moved, or maintained, nor shall any building, structure, or land be used or designed to be used for any use other than is permitted in the zone in which such building, structure, or land is located and then only after applying for and securing all permits and licenses required by all laws and ordinances."

### C. BUILDING REGULATIONS

Chapter IX, Article 1, Division 62 of the Code contains various building regulations pertaining to signs.

### 1. SECTION 91.6201.2 SIGN PERMITS

Among the building regulations, § 91.6201.2 mandates that "[a] building permit shall be obtained from the Depart-

---

**7.** The McNeilly declaration in the Jamison–Sky Tag Action claims that a Wall Sign is only allowed to contain an on-site message. (Jamison McNeilly Decl. (Jamison Docket No. 73) ¶ 20.) The Court does not find that this is the case. The McNeilly declaration refers to the deposition of Carols Villarreal, a City employee involved with reviewing sign applications. (*Id.*) Villarreal testified that "[t]ypically, it's the case that wall signs are on-site signs." (Jamison Mobley Decl. (Jamison Docket No. 76), Ex. 6 [Villarreal Dep. Tr. at 37:3–22] (emphasis added).) Villarreal then went on to testify that he would reject an application for an Wall Sign with an off-site message. (*Id.*) However, it is not clear whether this is because the sign was an Off-Site Sign (which was generally prohibited) or because it was both a Wall Sign and an Off-Site Sign. Accordingly, the Court does not conclude that a Wall Sign is limited to an on-site message. *See also,* Code § 14.4.2 (defini-

tion of "Wall Sign" with no on- or off-site message limitation).

**8.** This is compared to a "Temporary Special Display." The City enacted Ordinance No. 176,172, which created the Hollywood Supplemental Use District ("Hollywood SUD") and was meant to regulate signs in the Hollywood area. Ordinance No. 176,172 (available at http://planning.lacity.org/Code_Studies/Other/HwdSignOrd.pdf). A "Temporary Special Display" is a sign "used for special events, such as, but not limited to, a film or play premiere and initial run, a special film screening or series, or film festival; or community events, such as, but not limited to, parades, festivals and fairs." Ordinance No. 176,172 § 4. The Hollywood SUD purports to allow Temporary Special Displays to be "displayed for 120 days continuously or a combined total of 120 days over several intervals of time." Ordinance No. 176,172, § 7.O.1.c.

ment in accordance with the provisions of Section 91.106 of this Code **for any sign** (including a temporary sign) and/or sign alteration, **other than changes or replacement of copy,** that are regulated by this division or by Chapter I of the LAMC." (Emphasis added.)

Although § 91.6201.2 is directed to signs "regulated by this division [62] or by Chapter I of the LAMC," the Court does not see how any sign could escape § 91.6201.2 because Chapter I seems to regulate all signs. *See, e.g.,* Code § 14.4.2 (with expansive definition of "Sign"); *see also, e.g.,* Code § 14.4.4.D (governing maintenance of "signs"). Thus, a Supergraphic Sign requires a permit.

In addition, permits are required except for changes or replacement of copy. As to Supergraphic Signs that consist only of the copy, i.e., the vinyl mesh/material with the imagery, and an adhesive (as compared to a sign supported by cable and eyebolts), the Court does not see how one could change the copy without obtaining a new permit. Once the old copy comes down, there is no longer any sign. Accordingly, even if one were to put new copy on the exact same location, it would seem to be, in actuality, a new sign. However, this particular issue is not directly before the Court and the Court makes no findings in this regard.

### 2. SECTION 91.106 PERMITS

Section 91.106 sets forth the requirements and procedures for obtaining permits. "To obtain a permit, the applicant shall file an application on a form furnished by the department." Code § 91.106.3.1. The application must include a fair amount of information on the project, including "plans ... and specifications." Code §§ 91.106.3.1–3.2. The information required on plans and specifications is set forth in § 91.106.3.3. "When the plans and specifications fully comply with the provisions of Section 91.106.3.3, the Department **shall** place an official stamp of approval or an approval perforation on each sheet of each set and, upon payment of the permit fee, shall issue one set to the applicant." Code § 91.106.3.2.3 (emphasis added). Then, "[w]hen the department determines that the information on the application and plans is in conformance with this Code and other relevant codes and ordinances, the department **shall issue** a permit upon receipt of the total fees." Code § 91.106.4.1.

### 3. SECTION 91.6201.4 VIOLATIONS

Section 91.6201.4 of the Code is titled "Violations" and states:

"It shall be unlawful for any person to erect, construct, install, enlarge, alter, repair, move, remove, convert, demolish, use or maintain any sign or sign support structure or cause or permit those actions to be done, in violation of any of the provisions of this division.

Any person who violates or causes or permits another person to violate any of the provisions of this division is guilty of a misdemeanor."

### D. FIRE AND LIFE SAFETY HAZARDS

Chapter V of the Code governs "Public Safety and Protection." Article 7 is titled "Fire Protection and Prevention (Fire Code)" and contains regulations governing fire safety.

### 1. CODE § 57.22.01 COMBUSTIBLE DECORATIONS

Division 22 of Chapter V is titled "Combustible Decorations" and contains § 57.22.01, which in turn is titled "General Use of Combustible Decorations and Restrictions on Wearing Apparel." Section 57.22.01 states, in relevant part:

"A. No person shall install, maintain, or use for the purpose of decoration any drape, hanging curtain, drop, vegetation, bunting, cotton batting, plastic cloth, textile, excelsior, paper, or other combustible material that would tend to increase the fire and panic hazard in any building or premises to which the public is admitted or invited. Decorative materials shall be noncombustible, flame-retardant, or shall be treated and maintained in a flame-retardant condition by means of a flame-retardant process approved by the State Fire Marshal in accordance with Title 19, C.A.C."

Section 57.22.04.A.4 further provides that "[t]he Chief may, at any time, take samples from any Christmas tree or decoration and field test the specimen." [9]

### 2. CODE § 57.12.02 OBSTRUCTIONS

Division 12 of Article 7 is titled "Obstructions to Roofs and All Openings" and contains § 57.12.02 "Obstructions." Section 57.12.02 provides, in relevant part:

"No person shall install or maintain any wire, barbed wire, razor ribbon, fence, cable, aerial, antenna, or other obstruction on any building roof, parapet wall, or openings in an exterior wall required for Fire Department access, in such a manner as to obstruct access or egress, or cause a hazardous condition in the event of fire or other emergency."

### 3. CODE § 57.118.07 TEMPERED GLASS WINDOWS

Division 118 of Article 7 is titled "New High–Rise Buildings" and contains § 57.118.07, "Emergency Smoke Control System," which provides:

A system for removing products of combustion by natural or mechanical ventilation shall be provided for every floor or level of a high-rise building as follows: A. Natural Ventilation: **Smoke evacuation shall consist of openable or tempered glass windows in the exterior wall on each floor of the building.** Such venting facilities shall be provided at the rate of 20 square feet per 50 lineal feet of exterior wall in each story and distributed around the perimeter at not more than 50 foot intervals. Windows shall be clearly identified with a two-inch minimum diameter disc of luminour and/or reflective material with the word "TEMPERED" permanently applied to one of the lower inside corners either directly on the glass or on the frame.

(Emphasis added.)

### 4. FIRE SAFETY AND SIGNS

Kurt Fasmer, a City Fire Captain addressing the life safety threats Supergraphic Signs can pose, states that Supergraphic Signs that hang over a window or windows do not necessarily pose a safety threat. (WWR Suppl. Fasmer Opp. Decl. ¶¶ 1, 4.) However, Fasmer then notes that

---

9. By both the Chapter and Section titles, as well as the language of the section itself, § 57.22.01 governs "decorations" and "[d]ecorative materials." Regardless, the Fire Department believes this section is applicable to signs. (WWR Suppl. Fasmer Opp. Decl. (WWR Docket No. 211) ¶ 24.) Robert Rowe, a consultant with over 26 years of experience as a fire service veteran, but none with the Los Angeles Fire Department, opines that this section does not govern signs. (WWR Rowe Decl. (WWR Docket No. 208) ¶ 12.) Alfred

Hernandez, Jr., who had been with the Los Angeles Fire Department for 25 years until his retirement a year ago, states that Rowe's conclusions are credible and consistent with Hernandez Jr.'s knowledge, but Hernandez Jr. discusses § 57.22.01 as if it does apply to signs. (WWR Hernandez Jr. Reply Decl. (Docket No. 212) ¶¶ 13–16.) The Court concludes, based in part on Hernandez Jr.'s failure to disaffirm the application of § 57.22.01 to signs, that the Fire Department does view that section as applying to signs.

the Fire Department considers a sign a safety threat if it:

1. blocks access to or egress from windows;

2. obscures the visibility of or identification of windows;

3. prohibits the operation of windows that are designed to open and close;

4. eliminates the functionality of tempered glass windows that are required in High Rise Buildings; or

5. eliminates the functionality of windows that are sealed but designed, per the Building Code, so that they are breakable.

(WWR Suppl. Fasmer Opp. Decl. ¶ 4; *see also* Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 14:12–16:23].) [10]

Furthermore, the Fire Department considers a sign a safety threat if it is made out of improper material. (WWR Suppl. Fasmer Opp. Decl. ¶ 3.) First, the Fire Department seems to require that a sign be made of flame resistant material. (*See* WWR Suppl. Fasmer Opp. Decl. ¶ 21; Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 14:25–15:1].) However, the Fire Department relies on the Department of Building and Safety to determine whether any particular material qualifies as flame resistant.[11] (WWR Suppl. Fasmer Opp. Decl. ¶¶ 21, 23; Jamison Mobley Decl., Ex. 8[Molina Dep. Tr. at 15:1–16 ("Building and Safety, they check the flammability of the material …") ].) Second, and somewhat related to the first, it appears that the Fire Department is concerned that the signs will be made out of material that, during a fire, will damage the structural integrity of the building. (WWR Suppl. Fasmer Opp. Decl. ¶ 18.)

Despite these concerns, Molina states that not every supergraphic that covers a window presents a danger of access and egress. (Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 16:24–17:9].) According to Molina, it is safe for a Supergraphic Sign to cover a window if it is "done properly." (Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 16:24–9].) However "done properly" simply means that the sign has been approved by the Department of Building and Safety and the Fire Department. (Jamison Molina Dep. Tr. at 17:10–18:14.) [12] Fasmer likewise states that Supergraphic Signs that hang over a window or windows do not necessarily pose a safety threat. (WWR Suppl. Fasmer Opp. Decl. ¶ 4.)

If a sign over a window is a safety threat if it blocks access to or egress from

10. Alexander Molina is an inspector with the Los Angeles Fire Department who groups the concerns with Supergraphic Signs into three categories: 1. access and egress; 2. flammability; and 3. the ability to break tempered glass windows. (Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 6:14–16, 16:13–23].)

11. This assertion appears to contrast with Code § 57.22.04 concerning decorations. Code § 57.22.04.A.4 ("The Chief may, at any time, take samples from any Christmas tree or decoration and field test the specimen in accordance with L.A.F.D. . . .").

12. Page 18 of the Molina deposition transcript was not attached to the Jamison papers. However, the Jamison–Sky Tag Plaintiffs submitted the entire transcript separately. (*See* Jamison Docket No. 78 [Notice of Manual Filing].) In response to the question "What do you mean if its put up properly," Molina responded:

If it's approved by Building and Safety when you apply for a permit with Building and Safety, it's my understanding that they look at the flammability and how it's hung and then they give it to the fire department for the fire department to approve, then you get your permit. Without fire department approval, you don't get your permit. Without Building and Safety approval, you don't get your permit.
So if they approve it, it's good with me because then the fire department has looked at it and they've approved it.
(Jamison Molina Dep. Tr. at 18:4–14.)

the window, it is hard for this Court to image any sign over a window that is not a life safety threat. Indeed, Fasmer submitted an earlier declaration in which he states: "Obstructing a window **in any way** creates an imminent life safety hazard." (WWR Fasmer Decl. (WWR Docket No. 206) ¶ 4 (emphasis added).) Molina makes the exact same statement. (Jamison Molina Opp. Decl. ¶ 5 (same).)

Although the Court has two different Fire Department personnel taking the position that a Supergraphic Sign over a window is not always a safety issue, the Court has no evidence as to when this might actually be the case.[13] Instead, the Court has concomitant proclamations from these same fire personnel warning of the dangers involved when a Supergraphic Sign covers a window. Accordingly, the Court is left with only one logical conclusion: all Supergraphic Signs that cover windows pose a fire and life safety hazard.

### E. THE WORLD WIDE RUSH ORDER

The August 20, 2008 World Wide Rush Order invalidated Code §§ 14.4.4.B.9 and B.11, governing, respectively, Supergraphic Signs and Off–Site Signs. (*See generally* World Wide Rush Order.) These sections did not survive the WWR Plaintiffs' facial unfettered discretion challenge because of the discretion given to the City through the "Specific Plan," "Supplemental Use District" and "Development Agreement" exceptions. (World Wide Rush Order, 579 F.Supp.2d at 1318–22.) Furthermore, the Court found that the exceptions could not be severed from the general ban in §§ 14.4.4.B.9 and B.11. As

such, the World Wide Rush Order found B.9's and B.11's prohibition on Supergraphic and Off–Site Signs unconstitutional.[14]

In conjunction with the World Wide Rush Order, the Court issued an injunction ("World Wide Rush Injunction"), that reads, in part:

> The City, its officers, agents, servants, employees and attorneys, and all those acting in concert or participating with them, are hereby permanently enjoined from taking the following actions against supergraphic signs owned and operated by Plaintiffs or those in contractual privity with them at the 19 sites specified in the modified preliminary injunction:
>
> a. Enforcing section 14.4.4(B)(9) of the sign ordinance;
>
> b. Enforcing section 14.4.4(B)(11) of the sign ordinance;
>
> c. Enforcing section 14.4.6 of the sign ordinance.
>
> . . . .
>
> This injunction prohibits the City both from interfering with Plaintiffs' maintenance of their off-site signs and supergraphic signs and from issuing citations to Plaintiffs or those with whom they contract based on the above-cited code sections **or based on the inability of Plaintiffs to obtain permits for their off-site signs and supergraphic signs because of the City's enforcement of the above-cited code sections.** The City may inspect and verify Plaintiffs' signs to ensure that they have been constructed according to applicable code provisions to ensure the safe construction of signs.

---

**13.** Molina posits that it might be acceptable if the parts of the sign covering sealed windows were cut out, but this scenario negates the hypothesis—in that instance one is not faced with a Supergraphic Sign covering a window. (Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 19:17–25].)

**14.** The World Wide Rush Order also dealt with § 14.4.6, covering freeway facing signs. (World Wide Rush Order, 579 F.Supp.2d at 1324–28.) However, § 14.4.6 is not at issue in the present motions and, as such, is not discussed herein.

(World Wide Rush Injunction, 579 F.Supp.2d at 1329–30 (emphasis added).)

The World Wide Rush Injunction was directed at a limited number of locations within Los Angeles as identified by the WWR Plaintiffs. (World Wide Rush Injunction, 579 F.Supp.2d at 1329–30.) However, as noted, the WWR Plaintiffs prevailed on their **facial** challenges to § 14.4.4.B.9 and B.11.[15]

## F. INTERIM CONTROL ORDINANCE, ORDINANCE NO. 180445

Approximately four months after the World Wide Rush Order issued, the City enacted Ordinance No. 180445, also known as the Interim Control Ordinance ("ICO"). Effective on December 26, 2008 (*see* CRA/Liberty Request for Judicial Notice (CRA/Liberty Docket No. 18) at 2), the ICO provides that "for a period of 90 days from the effective date of this ordinance, or until a permanent ordinance which amends the citywide provisions governing Off–Site Signs, including Digital Displays and Supergraphic Signs becomes effective, whichever occurs first:

A. No building permit for an Off–Site Sign, including any Off–Site Digital Display or new Supergraphic sign shall be issued.

B. No person shall erect, place, alter or construct any Off–Site Sign, including any Off–Site Digital Display or Supergraphic Sign pursuant to a building permit issued prior to the effective date of this ordinance."

ICO § 2.

However, if a permit was issued prior to December 26, 2008, the ICO's prohibition would not apply:

"1. If the building permit holder has performed substantial work on or before the date of adoption of this ordinance by City Council and has incurred substantial liabilities in good faith reliance upon the building permit.

2. The work performed shall be considered substantial if construction pursuant to a valid building permit has progressed to the point that one of the inspections required by LAMC Section 91.108.5 has been made and the work for which the inspection was called has been approved by the Department of Building and Safety prior to the effective date of this ordinance."

ICO § 3.B.

## G. THE PERMITTING PROCESS

As noted above, permits are required for Supergraphic Signs. One of the first steps in securing a permit for a Supergraphic Sign is to obtain a Sign Pre–Inspection ("SPI"). (Jamison Mobley Decl., Ex. 5 [Wong Dep. Tr. at 32:4–7].) Before submitting the application for the sign, the applicant first submits "an application for sign pre-inspection." (Jamison Helt Decl. (Docket No. 72) ¶ 17.) The SPI application is submitted to the check-in counter at the Department of Building and Safety (also referred to as "Building and Safety" and "DOBS") and reviewed for completeness and, if complete, "is forwarded to the submittal counter for acceptance and processing." (Jamison Helt Decl. ¶¶ 17–18.)

"In the sign pre-inspection process, a DOBS inspector personally visits the project site to determine, among other things, whether the property is consistent with the representations contained in the appli-

---

**15.** The City argues that the World Wide Rush Order has been abrogated by Ninth Circuit's January 6, 2009 Opinion in *Metro Lights, L.L.C. v. City of Los Angeles,* 551 F.3d 898 (9th Cir.2009). The Court does not agree and briefly discusses *Metro Lights* below when addressing the City's Motion to Reconsider the Preliminary Injunction in the CRA/Liberty matter.

cation. The sign pre-inspection process typically takes about one week.[16] If the application passes sign pre-inspection, [the applicant is] notified of the approval" and the applicant prepares an application for the building permit and submits it to the City. (Jamison Helt Decl. ¶ 18.)

However, even before the SPI process, the applicant must obtain an approval letter ("Project Approval Letter"), from the Department of City Planning. (Jamison Mobley Decl., Ex. 3 [May 2, 2002 Memo from P. Kim] ("no building permits shall be issued without the clearance from the Department of City Planning"), Ex. 5 [Wong Dep. Tr. at 32:4–25, 52:25–53:4].) This letter should be included with the application for Sign Pre–Inspection. (Jamison Mobley Decl., Ex. 5 [Wong Dep. Tr. at 32:4–25].) If it is not, the DOBS will not accept the application. (Jamison Mobley Decl., Ex. 6 [Villarreal Dep. Tr. at 12:14–13:24].)

In addition, once the application is in the system, i.e., beyond the SPI stage, applications for Supergraphic Signs require clearance from the Fire Department. (Jamison Helt Decl. ¶ 8.) [17] For this clearance, the applicant would take a sample of the sign material to the Fire Department along with "specification sheets showing that the material had been approved by an independent testing agency." (Jamison Helt Decl. ¶ 8.) According to Helt, the "fire marshal would then go out with [him] in the stairwell and try to light the material sample to confirm that it is flameproof and

would then sign the clearance sheet clearing the material." [18] (Jamison Helt Decl. ¶ 8.)

Generally speaking, the City has a "Sign Manual," which sets forth the application procedures for putting up various types of signs, including Off–Site and Supergraphic Signs. (Jamison Mobley Decl., Ex. 2 [Sign Manual].) According to Arthur Wong, the DOBS employee designated by the City as most knowledgeable on the application process, the Sign Manual contains all of the DOBS policies for processing sign applications in effect throughout the entirety of 2008 and up to February 2009. (Jamison Mobley Decl., Ex. 5 [Wong Dep. Tr. at 15:11–18, 16:12–15].)

This is unfortunate because the Sign Manual does not contain the most updated code sections. More importantly, however, it is unfortunate because, though in use up to February 2009, it lists Supergraphic Signs as prohibited under § 91.6205.11, the precursor code section to § 14.4.4.B.9. After the World Wide Rush Order issued, the City did not change the procedures carried out in the application process. (Jamison Mobley Decl., Ex. 5 [Wong Dep. Tr. at 12:5–9, 58:8–24, 79:22–80:7]; Ex. 6 [Villarreal Dep. Tr. at 26:22–28:22].)

## H. THE CITATION PROCESS

### 1. CODE CITATIONS

Although the application process was not modified in light of the World Wide Rush Order, the Code Enforcement Bu-

---

**16.** According to Helt, "an SPI report is issued no later than two weeks after submission of the SPI." (Jamison Helt Decl. ¶ 37.) Typically, an SPI is done within 72 hours. (Jamison Mobley Decl., Ex. 12 [Buchan Dep. Tr. at 29:12–19].)

**17.** Helt, over the past few years, has "prepared and submitted to the City's DOBS approximately 20 applications for off-site supergraphic signs in the Hollywood SUD area and

obtained a number of permits from DOBS for supergraphic temporary display signs in the Hollywood SUD area." (Jamison Helt Decl. ¶ 10.)

**18.** Molina, who does not handle the approval process, states that this stairwell match test is only done with Christmas trees, not supergraphic signs. (Jamison Courtney Decl. (Docket No. 77), Ex. D [Molina Dep. Tr. at 26:3–18].)

reau's inspectors stopped citing the unconstitutional provisions of the code in October of 2009. (Jamison Mobley Decl., Ex. 7 [Bush Dep. Tr. at 34:6–22, 35:16–20].) However, the City still cited signs for failure to obtain a permit. (Jamison Mobley Decl., Ex. 7 [Bush Dep. Tr. at 36:15–18].) Furthermore, inspectors were instructed to cite Supergraphic Signs as Walls Signs or Banner Signs. (Jamison Mobley Decl., Ex. 7 [Bush Dep. Tr. at 38:5–7, 44:]; *see also id.* Ex. 7 [Bush Dep. Tr. at 44:15–22].)

Citations were issued as "Orders to Comply." These orders "indicate that an administrative appeal can be filed within 15 days of the compliance date." (Jamison Helt Decl. ¶ 38; *see, e.g.,* WWR Rush Decl. (Docket No. 208), Ex. B [January 21, 2009 Order to Comply ("If an appeal or request for slight modification is not filed within 15 days of the compliance date …")].) However, at least one City employee has allegedly stated that there is no right to appeal an order to comply when permits were never obtained for the sign. (Jamison Helt Decl. ¶ 40 (recounting conversation with James Buchan).) [19]

## 2. FIRE SAFETY CITATIONS

The Fire Department set forth a policy that "any unpermitted supergraphic signs applied to the windows of a sealed office building should be cited for access and egress issues." (Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 24:14–20].) The Fire Department also had all unpermitted signs cited for flammability issues. (Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 27:3–6].) In essence, the Fire Department would cite any Supergraphic Sign that was unpermitted for life safety issues, not because there actually were life safety issues, but because the lack of a permit

was proof that neither DOBS or the Fire Department had signed off on the safety of the sign (during the approval process). (*See* Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 34:5–13, 60:8–62:6].) Generally, the only proof that would be acceptable to the official giving the citation was an actual permit. (*See* Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 25:20–23, 32:6–16, 34:5–13].)

As such, if a sign were made out of flame-proof material that the Fire Department considered acceptable, but there was no permit for the sign, the sign would be cited for being made out of flammable material. Furthermore, the proprietor could not discharge the citation by showing that the sign was actually made out of the accepted material, but could only discharge the citation by obtaining a permit. Lastly, there is no official appeal process for a Fire Department citation. (Jamison Mobley Decl., Ex. 8 [Molina Dep. Tr. at 79:12–21].)

## I. SUMMARY

Prior to the World Wide Rush Order, if a company wanted to put up a sign in the City, it first had to obtain a permit (§ 12.21(A)(1)(a); § 91.6201.2). In addition, the company would have to ensure that the sign complied with applicable zoning requirements (§ 12.21(A)(1)(a)). If the sign was an Off–Site or Supergraphic Sign, the sign would not be allowed—meaning, presumably, a permit would not issue—unless it fell within certain exceptions, i.e., adopted pursuant to a specific plan, supplemental use district or development agreement (§§ 14.4.4.B.9 and B.11).

After the issuance of the World Wide Rush Order, but before the effective date

---

**19.** Buchan has since apparently stated that appeals would be accepted. (Jamison Helt Decl. ¶ 42.) However, the City still refused to accept appeals for citations that had been transferred to the City Attorney for prosecution, even if the time for appeal had not yet expired. (Jamison Helt Decl. ¶ 43.)

of the ICO, if a company wanted to erect a sign in the City, it still had to obtain a permit first (§ 12.21(A)(1)(a); § 91.6201.2). As noted above, § 91.6201.2 requires permits "for any sign,"; it does not matter if the sign is a Supergraphic Sign or OffSite Sign.[20] In addition, the company still had to ensure that the sign complied with applicable zoning requirements (§ 12.21(A)(1)(a)). However, if the sign was an Off–Site or Supergraphic Sign, the City could not deny a permit for that reason, i.e., because the sign was either a Supergraphic or Off–Site Sign.

Nor could the City deny a permit—or issue citations—by relying on sign provisions that did not cover the proposed sign. For instance, if the proposed sign was to remain in place longer than thirty days, the sign was, by definition, not a Temporary Sign. Code § 14.4.2 (Temporary Sign "is to be maintained for a limited duration, not to exceed 30 days."). The regulation for Temporary Signs was not applicable. Likewise, if a Supergraphic Sign exceeded the dimensions allowed by § 14.4.10 for Wall Signs, the sign application could not be denied—and the sign could not be cited—for violating § 14.4.10. This follows the plain language of the Code.[21] Ultimately, if the proposed Supergraphic Sign complied with all **applicable** Code provisions— save the ban on Supergraphic and Off–Site

Signs—and application procedures, the City was required to issue a permit (§ 91.106.4.1).

This is not what happened, however. In the wake of the World Wide Rush Order, various companies applied for permits for Supergraphic Signs. Instead of adopting new regulations that cured the constitutional infirmities identified in the World Wide Rush Order, or simply accepting the applications and issuing permits, the City refused to accept permits, following the unconstitutional prohibitions in §§ 14.4.4.B.9 and B.11. In response, some of these sign companies began to put up unpermitted Supergraphic Signs throughout the City. Sign companies attempted to apply for permits for some of the signs, but not all. In the interim, the City enacted the ICO and the landscape changed drastically. Off–Site and Supergraphic Signs were prohibited. (ICO § 2.)

After the World Wide Rush Order, the City should not have rejected permit applications based on §§ 14.4.4.B.9 and B.11. However, nothing in the World Wide Rush Order found that a Supergraphic Sign did not have to comply with other Code sections. As such, the City was free to cite Supergraphic Signs for other Code violations. However, citations based on a failure to obtain a permit during the time period between issuance of the World

---

**20.** There are certain exceptions to the permitting requirement of § 91.6201.2; however, none are applicable here. Code §§ 91.6201.2.1.a–c.

**21.** Obviously, the Court finds less than convincing the City's attempt to act as if the World Wide Rush Order transported the City to a time before its explicit bans on Supergraphic Signs. (*See* WWR Suppl. Lara Opp. Decl. (Docket No. 211) at 2 (attaching "Orders to Comply [DOBS] has been issuing pursuant to the city's pre–2002 regulations").) The World Wide Rush Order found limited provisions of the Code unconstitutional—no more and no less. It was not a time machine.

Regardless, the City attempts to rely on the historical claim that the Code "has never allowed supergraphic signs." (WWR Opp. (Docket No. 211) at 14.) However true that may be, not allowing signs is a wholly separate proposition from actively prohibiting them. The Code may not have explicitly allowed such signs, but it does not seem to have explicitly prohibited them either. When something is not regulated, it is just that: not regulated. The Court is not familiar with the proposition that when legislation fails to regulate certain subject matter, the "most closely" (WWR Opp. at 14) relevant legislation will control **when that legislation, by its own terms, is not applicable.**

Wide Rush Order and implementation of the ICO are suspect. Furthermore, though it would seem to go without saying, citations to inapplicable Code sections are also suspect. All of this, however, is largely irrelevant if the Supergraphic Sign went up after the ICO which banned all new permits for Supergraphics.

### III. THE WWR PLAINTIFFS' MOTION TO ENFORCE JUDGMENT

The WWR Plaintiffs have brought a motion (WWR Docket No. 208) asking the Court to enforce the World Wide Rush Order and find the City in contempt for violating the World Wide Rush Injunction. In particular, the WWR Plaintiffs are upset because the City has issued citations, and initiated a criminal complaint, as to a sign at 10801 National Boulevard. The City has also cited a sign at 5150 Wilshire Boulevard.

In sub-section "A" below the Court briefly addresses the contempt standard. In sub-sections "B" and "C", the Court addresses the citations at, first, the 10801 National location and then, second, at the 5150 Wilshire location. Sub-section "D" covers the concomitant state court proceeding and sub-section "E" addresses the relief granted.

### A. CONTEMPT STANDARD

Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, ("*In re Dual–Deck Video*"), 10 F.3d 693, 695 (9th Cir.1993). "The party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by 'clear and convincing evidence,' not merely a preponderance of the evidence." *In re Dual–Deck Video*, 10 F.3d at 695 (citing *Vertex Distrib., Inc. v. Falcon Foam Plastics,*

*Inc.*, 689 F.2d 885, 889 (9th Cir.1982)). "The contempt 'need not be willful,' and there is no good faith exception to the requirement of obedience to a court order." *In re Dual–Deck Video*, 10 F.3d at 695 (citing *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1363 (9th Cir. 1987)). The City does not argue that the World Wide Rush Injunction is indefinite or unspecific. Accordingly, compliance is the relevant issue.

### B. 10801 NATIONAL BOULEVARD

The City issued an Order to Comply as to signs at 10801 National Boulevard, citing as "VIOLATION(S)":

> "No permit was obtained for the installation of a sign and supporting members which may constitute a wall sign or temporary banner at this location. Further, the sign may be in violation of Ordinance No. 180445 ... Code Section(s) in Violation: 91.6201.2, 91.6201.4, 14.4.10, 14.4.16, 12.21.A.1.(a) ..."

(WWR Rush Decl. Ex. B (Order to Comply).) The citation references two signs, one on the North Wall and one on the East wall. (WWR Rush Decl., Ex. B.) Furthermore, the City initiated a criminal complaint against World Wide Rush for allegedly violating various code sections. (WWR Rush Decl., Ex. D (Feb. 9, 2009 letter from Office of the City Attorney); WWR Bostrom Ex Parte Opp. Decl. (Docket No. 206), Ex. G.) Last, the Fire Department issued a citation for Code §§ 57.12.02 and 57.22.01 concerning fire safety, specifically, obstructions to access or egress and use of combustible decorations. (WWR Rush Decl., Ex. E [Fire/ Life Safety Violation].) The question facing the Court is whether these were valid citations, or whether they are the result of the City's attempt to enforce Code §§ 14.4.4.B.9 and B.11 in violation of the World Wide Rush Injunction.

### 1. THE §§ 12.21.A.1.(A), 91.6201.2, AND 91.6201.4 CITATIONS

As noted above, §§ 12.21.A.1.(a) and 91.6201.2 require that the WWR Plaintiffs obtain permits for any sign and § 91.6201.4 makes it unlawful to erect a sign without a permit. The WWR Plaintiffs do not have a permit for either sign at the 10801 location. (*See* WWR Fisher Decl. (WWR Docket No. 208) ¶¶ 2–3.) Accordingly, the citations for failing to obtain a permit were facially proper.

■ However, the WWR Plaintiffs do not have a permit because the City continued to enforce § 14.4.4.B.9 even after it was found unconstitutional. (WWR Fisher Decl. ¶ 3.) The WWR Plaintiffs applied for permits for the 10801 National location, but the City refused to accept the applications, specifically relying on the ban in § 14.4.4.B.9. (WWR Fisher Decl. ¶ 3 ("I was advised by the counterperson that because supergraphic signs were prohibited by the City of Los Angeles pursuant to § 14.4.4(B)(9) of the Sign Ordinance and that applications would not be accepted or processed as a result.").) The City does not rebut the WWR Plaintiffs' evidence on this front. Nor does the City claim that the World Wide Rush Injunction was unclear.

Because the WWR Plaintiffs sought a permit but were denied one based on § 14.4.4.B.9, the citation for lack of a permit flies directly in the face of the World Wide Rush Injunction which "prohibits the City ... from ... issuing citations ... based on the inability of Plaintiffs to obtain

permits for their off-site signs and supergraphic signs because of the City's enforcement of the abovecited [i.e., § 14.4.4.B.9] code sections." (World Wide Rush Injunction, 579 F.Supp.2d at 1330.) Accordingly, the Court finds by clear and convincing evidence that the City is in contempt of the Court's injunction as a result of the citations under §§ 12.21.-A.1.(a), 91.6201.2, and 91.6201.4 as to the 10801 National location.

### 2. THE §§ 14.4.10 AND 14.4.16 CITATIONS

■ The City also cited violations of the requirements for Wall Signs, § 14.4.10, and Temporary Signs, § 14.4.16. However, the signs at the location are not Temporary Signs. The copy at the location "changes every one to three months" and the structure supporting the copy is permanent. (WWR Rush Decl. ¶ 4.) Nor is the sign on the North side a Wall Sign governed by § 14.4.10. The City itself has referred to the same exact type of sign, at this location, as a Supergraphic Sign under § 14.4.4.B.9, which, by definition, is not governed by § 14.4.10. (WWR Rush Decl. ¶ 14; WWR Rush Decl., Ex. F (March 10, 2009 Order to Comply).) The Court does not have enough information as to the sign on the East wall to determine whether or not it falls under the purview of § 14.4.10.

The City relies on §§ 14.4.10 and 14.4.16 because they are the "closest thing" (WWR Opp. at 14) the City has that would regulate the signs at issue. However, the "closest thing" is not close enough. *See* footnote 21 *supra* (discussing City's attempt to enforce pre–2002 regulations).[22]

---

22. The City argues that:

"Under World Wide Rush's interpretation, if a sign operator comes in and applies for a wall sign, or a temporary sign, and if the Department of Building and Safety issues a correction letter advising the applicant that his proposed sign does not comply with the regulations governing those signs, the sign operator need simply opt out of the wall sign and off-site provisions by stating that

he is instead deciding to erect a 'supergraphic sign,' a sign, that by definition, does not comply with wall sign and temporary sign provisions."

(WWR Opp. at 15.) As to the period when the City no longer had a ban on Supergraphic Signs—from the time of the World Wide Rush Order to the effective date of the ICO—the City is, more or less, correct. The City cannot now complain because it failed to regulate

The Court can only conclude that the City was, once again, attempting to enforce the unconstitutional bans in §§ 14.4.4.B.9 and B.11.[23]

Accordingly, the Court finds by clear and convincing evidence that the City is in contempt of the Court's injunction as a result of the citations under § 14.4.10 as to the signs at the 10801 National location. By clear and convincing evidence, the Court also finds the City in contempt of the Court's injunction as a result of the citation under § 14.4.16 as to the sign on the North wall at the 10801 location.

### 3. THE ORDINANCE NO. 180445—ICO—CITATION

■ After December 26, 2008, construction or alteration of a Supergraphic Sign was prohibited unless a permit had already issued and substantial work had been done. ICO §§ 2–3. Work is considered substantial when the construction "has progressed to the point that one of the

inspections required by LAMC Section 91.108.5 has been made and the work for which the inspection was called has been approved by the Department of Building and Safety **prior to the effective date of this ordinance.**" ICO § 3.B.2 (emphasis added). Section 91.108.5 calls for seven different inspections, only one of which seems applicable here: the final inspection.[24]

Under the ICO the inspection (and approval) must have occurred **prior** to December 26, 2009. Here—even if one sets aside the permit requirement—the WWR Plaintiffs have failed to establish that the sign was ready for such an inspection by December 25, 2009. Indeed, a final inspection occurs when "the work is completed." *See* Code § 91.108.5. The work was not complete until after the effective date of the ICO. (WWR Suppl. Lara Opp. Decl. (Docket No. 211) ¶¶ 3–5.) Accordingly, the ICO citation was valid. Furthermore, there is no evidence to suggest that the

---

Supergraphic signs during that period. However, even if a party "opted out" of the Wall Sign or Temporary Sign provisions, a permit was still required.

23. Ironically, even in light of the World Wide Rush Order, the City did not need to rely on §§ 14.4.10 and 14.4.16 to regulate (as compared to prohibit) Supergraphic Signs before enactment of the ICO. Under § 91.6201.2, a permit was still required for these signs. From the Court's limited review of the Code, it is via this permitting process that the City could ensure that the sign meets all applicable Code provisions. However, in order to enforce this regulatory power in the first instance, the City would have to accept the permit applications, rather than deny them outright based on provisions found unconstitutional.

24. In total, § 91.108.5 lists "the following inspections:

1. Foundations. When the excavation for footings is complete and footing forms and required reinforcing steel are in place, but before any concrete is placed.

2. Wood framing, ventilation equipment installation. When all roof, walls and floor framing, fire stopping and bracing are complete and all pipes, chimneys, vents and ductwork are in place, but before any of this work is covered.

3. Wall covering. When the backing and lath or drywall are in place ready for plaster, stucco or taping.

4. Reinforced concrete. When forms and reinforcing steel are in place ready for concrete.

5. Reinforced masonry. In grouted masonry when vertical reinforcing steel is in place and other reinforcing steel distributed and ready for placing, but before any units are laid up.

6. Structural steel. When structural steel members are in place and required connections are complete, but before concealing any members or connection.

7. Final. When the construction or work is completed and the structure ready for occupancy, but before being occupied."

Code § 91.108.5.

City was attempting to enforce the bans in §§ 14.4.4.B.9 and 11. It did not need to. It had the ICO. Accordingly, the ICO citation for the 10801 National location was not a violation of the injunction.

## 4. SECTION 57.12.02 CITATION

■ This concerns the fire safety section regarding obstructions. Given that the signs at the 10801 National location hang over windows (*see* WWR Denny Decl. (Docket No. 208) ¶ 4), this was a valid citation. The only evidence that this citation is a subterfuge is the claim that the City is not taking similar action as to other signs that hang over windows. However, the City has presented evidence that although it has not yet issued citations for every applicable sign, the "Fire Department is doing everything it can, with the limited resources available to it, to address the problem." (WWR Suppl. Fasmer Opp. Decl. ¶ 28.) Accordingly, the Court does not find by clear and convincing evidence that this citation was an attempt to evade the World Wide Rush Injunction.[25]

## 5. SECTION 57.22.01 CITATION

■ This section governs decorations and fire resistant material. Given that the Fire Department considers this Code section enforceable against signs, the citation, on its face, does not appear to be an attempt to enforce §§ 14.4.4.B.9 and B.11. However, § 57.22.01 requires use of flame-retardant material "approved by the State Fire Marshal in accordance with Title 19, C.A.C." The WWR Plaintiffs claim the citation is a subterfuge because the sign is

actually made of a material approved by the Fire Marshall. (WWR Suppl. Rush Reply Decl. ¶¶ 3–4, Ex. A [Fire Marshall approval].)

It appears to be the Fire Department's position that it does not matter that the WWR Plaintiffs have this approval. Despite the explicit requirement in § 57.22.01 for approval from the State Fire Marshall, the Los Angeles Fire Department "will not accept . . . a certificate from the California State Fire Marshal." (WWR Suppl. Fasmer Opp. Decl. ¶ 21.) Instead, the Fire Department claims that only the Department of Building and Safety can verify approval by the State Fire Marshal. (WWR Suppl. Fasmer Opp. Decl. ¶¶ 21–23.) The Fire Department will only discharge its citation if the WWR Plaintiffs prove to the Department of Building and Safety that the material is appropriate. (WWR Suppl. Fasmer Opp. Decl. ¶ 23.) In contrast, Hernandez, Jr., who served with the Fire Department for 25 years and who rose to become both a battalion and assistant chief, takes the position that it is the Fire Department's responsibility to review the material. (WWR Hernandez Jr. Reply Decl. ¶¶ 15–16.)[26]

It is not clear, on the present evidence, how the approval process is actually conducted. Although the Court is highly suspicious of what appears to be a shell-game of responsibility played by the City, the Court cannot conclude by clear and convincing evidence that the § 57.22.01 citation was an attempt to evade the World Wide Rush Order. Regardless of whether the Fire Department should accept the approval from the Fire Marshal, when the

---

**25.** The evidence is actually conflicting as to whether the sign on the East wall hangs over windows. (*Compare* WWR Denny Opp. Decl. ¶ 4 with WWR Suppl. Rush Reply Decl. ¶ 5.) However, even if the Fire Department incorrectly cited the sign for obstruction, that does not change the Court's conclusion that the citation is not an attempt to enforce the bans in §§ 14.4.4.B.9 and B.11. (*See* discussion of 5150 Wilshire location below.)

**26.** Helt's account of the approval process also indicates that the Fire Department is involved in approving sign material. (Jamison Helt Decl. ¶ 8.)

citation was issued it does not seem the Fire Department could have known whether the material was flame-retardant. There was no permit application on file specifying the material used. (*See* Code § 91.106.3.3) Accordingly, the Court does not find that the citation was issued in violation of the World Wide Rush Injunction.

### C. 5150 WILSHIRE BOULEVARD

The signs at 5150 Wilshire Boulevard were cited for violating Code §§ 57.22.02(A), 57.22.01(A) and 57.118.07 concerning fire safety hazards, as well and Title 23, Part 2, Vol. 1, § 108.4.1 of the California Code of Regulations.[27] (WWR Rush Decl., Ex. H [Fire/Life Safety Violation].) Again, the Court must determine whether these were valid citations or an attempt to enforce §§ 14.4.4.B.9 and B.11 in contravention of the World Wide Rush Injunction.

### 1. SECTION 108.4.1 OF THE CALIFORNIA CODE OF REGULATIONS

██ California Code Section 108.4.1 is the concomitant state law code section to Code §§ 12.21.A.1.(a) and 91.6201.2 requiring building permits. The WWR Plaintiffs do not have a permit for either sign. (*See* WWR Fisher Decl. (WWR Docket No. 208) ¶¶ 2–3.) Accordingly, the citations for failing to obtain a permit were facially proper. However, the WWR Plaintiffs do not have a permit because the City continued to enforce § 14.4.4.B.9 even after it was found unconstitutional. (WWR Fisher Decl. ¶ 3.) For the same reasons discussed above, the Court finds by clear and convincing evidence that the City is in contempt of the Court's injunction as a result of the citations under California Code § 108.4.1 as to the 5150 Wilshire location.

### 2. SECTION 57.22.02(A) CITATION

██ The citation cites to "LAMC 57.22.02(A)." (WWR Rush Decl., Ex. H.) It then states that "[n]o person shall install or maintain any obstruction...." (WWR Rush Decl., Ex. H.) However, § 57.22.02(A) has nothing to do with obstructions. That section concerns sale of combustible material. Code § 57.22.02 ("Sale of Combustible Decorations and Wearing Apparel"). To the extent the citation is for obstructions, the signs at the 5150 Wilshire location do not cover any windows. (WWR Krantz Decl. (Docket No. 210) ¶ 9.)

Regardless, the Court does not find that this citation is a violation of the World Wide Rush Injunction. Fire Inspector Charles Garcia, who issued the citation (WWR Rush Decl., Ex. H [citation]), states that because of the massive size of the sign, he "could not see whether or not the sign is covering windows" but that he assumed this was the case "[g]iven that windows are located just next to the sign." (WWR Garcia Opp. Decl. (Docket No. 211) ¶ 4.) In situations involving fire safety, the Court cannot fault the inspector for erring on the side of caution.[28] (WWR Garcia Opp. Decl. ¶ 6.)

---

**27.** Title 24, part 2 of the California Code of Regulations, in which this section is found, "is also known as the California Building Code and is published separately under that name." *Urhausen v. Longs Drug Stores California, Inc.*, 155 Cal.App.4th 254, 65 Cal. Rptr.3d 838 (2007).

**28.** Garcia also claims that the World Wide Rush Plaintiffs "need only demonstrate [the lack of windows] to the Fire Department in order to discharge that portion of the notice." (WWR Garcia Opp. Decl. ¶ 7.) Again, how these citations are actually resolved is not clear to the Court. Although Garcia's assertion may be true, the citation submitted to the Court only demands removal of the sign; it does not specify how one would appeal the citation or show the factual assertions underlying the citation are incorrect. Furthermore, as noted above, there does not even appear to

### 3. SECTION 57.118.07 CITATION

This section concerns tempered glass windows. The citation demands: "Remove super graphic sign from tempered glass windows (or make openable) on the exterior of the building that are designed for smoke evacuation." (WWR Rush Decl., Ex. H.) Even though the signs at the location do not cover windows, for the reasons stated immediately above, the Court does not find that the citation was in violation of the World Wide Rush Injunction.

### 4. SECTION 57.22.01(A) CITATION

This section governs decorations and fire resistant material. Given that the Fire Department considers this Code section enforceable against signs, again, the Court cannot conclude that the citation is a backdoor method of enforcing §§ 14.4.4(B)(9) and (11).

### D. STATE COURT CRIMINAL ACTION

 The City has also brought a misdemeanor complaint against World Wide Rush. (WWR Bostrom Ex Parte Decl., Ex. G.) World Wide Rush asks the Court to enjoin that proceeding as a violation of the injunction. The misdemeanor complaint alleges, among other counts, that World Wide Rush violated Code § 91.6201.4 by failing to have a permit for the sign at the 10801 National location. (WWR Bostrom Ex Parte Decl., Ex. G at 1.) In this regard, the City's action in prosecuting the misdemeanor complaint is in violation of the World Wide Rush Injunction. However, the Court declines to enjoin the state court proceeding. *See Younger v. Harris,* 401 U.S. 37, 43–53, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) ("courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief").[29] World Wide Rush has presented no argument that its rights cannot be adequately protected in the state court proceeding. Indeed, World Wide Rush is completely capable of presenting the injunction to the state court. Furthermore, World Wide Rush will be armed not only with the injunction, but with this order, which explicitly finds the City in contempt for violating the injunction.

### E. CONCLUSION

After issuance of the Court's injunction, but before enactment of the ICO, the WWR Plaintiffs applied for permits, but those applications were denied outright under § 14.4.4.B.9. The WWR Plaintiffs maintained their signs nonetheless. The Court notes that adoption of self-help comes with many perils. Nevertheless, the Court is not called upon here to rule whether the WWR Plaintiffs' self-help in this situation was proper. The issue before the Court is whether or not the City violated the injunction. To that end, the injunction clearly prohibits "citations . . .

---

be a formal appeal procedure. Last, given the evidence presented that there are no windows under the signs at this location, one would think the City would have discharged this portion of the citation, and noted as such in its opposition papers.

**29.** World Wide Rush argues that *Younger* does not apply because in *Younger* the state court case preceded the federal case whereas here the federal case preceded the state court litigation. (WWR Mem. (Docket No. 208) at 18.) The comparison does not hold. The situation here does not involve a state court action brought during a federal action. The state court litigation came after final judgment in this matter. (*See* World Wide Rush Injunction ("The Court further ORDERS that there being no claims left to litigate in this action, that this judgment is the final judgment in this action.").)

based on the inability of Plaintiffs to obtain permits for their off-site signs and super-graphic signs because of the City's enforcement of the above cited code sections." The City did just that.

▮▮▮▮ Accordingly, the Court **FINDS** clear and convincing evidence that the City is in contempt of the World Wide Rush Injunction. The Court **ORDERS** the City to discharge the citations for §§ 12.21.-A.1.(a), 14.4.16, 91.6201.2, and 91.6201.4 as to the 10801 National location **within 10 days** of this order. Furthermore, the Court **ORDERS** the City to discharge the citation under § 14.4.10 as to the sign on the North wall at the 10801 National location **within 10 days** of this order.[30] The Court also **ORDERS** the City (and Fire Department) to discharge the citation for California Code of Regulations § 108.4.1 as to the 5150 Wilshire location **within 10 days**. As a sanction, the Court **AWARDS** the WWR Plaintiffs the fees and costs incurred in bringing their *ex parte* application (Docket No. 205) and this motion (Docket Nos. 208 *et seq.*).[31, 32]

However, the Court does not find that the remaining fire safety citations were in violation of the injunction. The Court is persuaded that the Fire Department has legitimate concerns as to the safety of Supergraphic Signs. Granted, the City's approach to these concerns has not been entirely convincing; the City's citation to inapplicable code sections and less than uniform application to signs across the City raises serious doubts as to the justification for the citations. Indeed, the Court is troubled by the apparent lack of effort to police fire safety violations in the Hollywood SUD.[33] Ultimately, however, the Fire Department's concerns outweighed the City's erratic citation methodology.

Furthermore, because there does not appear to be an appeal process as to the Fire Safety citations, and because it is not clear how one resolves those citations, the Court **ORDERS** the City to notify the WWR Plaintiffs, **within 10 days** of this

---

30. The City should likewise discharge the § 14.4.10 citation to the East wall if, as the Court suspects, it does not fit within the confines of that section.

31. "Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both." *Gen. Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1380 (9th Cir.1986) (citations omitted); *see also United States v. Rylander,* 714 F.2d 996, 1001 (9th Cir.1983). Compensatory sanctions are limited to actual losses sustained as a result of the contumacy. *Gen. Signal,* 787 F.2d at 1380 (citations omitted). At this juncture, the only losses suffered by the WWR Plaintiffs are the fees and costs spent pursuing the City's compliance. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) ("a court may assess attorneys' fees for the willful disobedience of a court order ... as part of the fine to be levied on the defendant.") (citations and internal quotation marks omitted.)

32. The Court **ORDERS** the WWR Plaintiffs to submit an accounting to the City **within 30 days** of this order. The City should make payment to the WWR Plaintiffs **within 40 days** of this order. If the City objects to the amount, and the WWR Plaintiffs and the City are not able to reach agreement on the appropriate recovery, the City can withhold payment and the parties should stipulate to, and submit to the Court, **within 40 days** of this order, a briefing schedule for resolution of the issue.

33. Accordingly, even though the Fire Department is already making efforts in this regard (WWR Suppl. Fasmer Opp. Decl. ¶¶ 26–30), to assuage plaintiffs'—and the Court's—concerns, the Court **ORDERS** the City and Fire Department to file a report with the Court, **within 60 days** of this order, as to how many Supergraphic Signs in the Hollywood SUD still cover windows and how many of those signs have been cited for fire safety violations.

order, as to how they can appeal the citations and/or meet the Fire Department's concerns. Whatever that process may be, for the 10801 National and 5150 Wilshire locations it CANNOT involve applying for a permit that will simply be denied under §§ 14.4.4.B.9 or B.11 or the ICO.[34] To be clear, the Court will not countenance gamesmanship. The Fire Department's safety concerns need to be legitimately addressed—not used as a litigation tactic.

## IV. JAMISON 1055 WILSHIRE AND SKY TAG, INC.'S MOTION FOR PRELIMINARY INJUNCTION

The Jamison–Sky Tag Plaintiffs have brought a motion (Jamison Docket No. 71) for a preliminary injunction prohibiting the City, under the auspices of the World Wide Rush Order, from interfering with signs at 118 locations. The Jamison–Sky Tag Plaintiffs previously sought a temporary restraining order as to these 118 locations, and the Court granted relief as to three locations that had already cited by the City and for which the Jamison–Sky Tag Plaintiffs had submitted permit applications. (January 15, 2009 Order ("Jamison TRO") (Jamison Docket No. 55).) However, the Jamison TRO was of limited duration and was only granted to allow the Jamison–Sky Tag Plaintiffs the opportunity to show that their permit applications were denied based on the City's wrongful enforcement of §§ 14.4.4.B.9 and B.11. (Jamison TRO at 5.) The Court also wished to give the parties the opportunity to ade-

quately brief the affect, if any, of the ICO on the relief sought. (Jamison TRO at 6.)[35] The Court has now received and reviewed the parties' briefing.[36] In the section immediately below, the Court begins its discussion by noting that the president of Sky Tag, Michael McNeilly, has no credibility with this Court. After discussing McNeilly's credibility, the Court addresses the underlying relief sought.

### A. CREDIBILITY

The Jamison–Sky Tag Plaintiffs first moved *ex parte* for a temporary restraining order. In conjunction with that briefing, McNeilly submitted a declaration that attached "a list of 118 locations of off-site supergraphic signs erected by the Sky Tag Plaintiffs." (Jamison McNeilly Ex Parte Decl. (Jamison Docket No. 48) ¶ 4.) According to McNeilly, "[a]ll of the locations listed [ ] were **imaged** by the Sky Tag Plaintiffs **with a supergraphic sign** prior to the City's enactment of its Interim Control Ordinance." (Jamison McNeilly Ex Parte Decl. ¶ 6 (emphasis added).) However, McNeilly did not clarify what he meant by "imaged" in the *ex parte* papers. Apparently, he meant that "smaller supergraphic signs were placed to indicate the location of the intended full-size supergraphics for which permits were being sought from the City." (Jamison McNeilly Reply Decl. (Docket No. 80) ¶ 10.) However, this is not set forth in the *ex parte* declaration. It is obvious to all that one key issue in this litigation is whether or

---

**34.** Although the ICO banned Supergraphic Signs, for signs erected prior to the ICO, the City cannot now rely upon the ICO to justify its denial of applications submitted during the time period at issue—after the World Wide Rush Order but before enactment of the ICO.

**35.** The Court also wished to allow the City to brief the effect, if any, of the *Metro Lights* opinion. (Jamison TRO at 6.) As previously noted, the Court does not find that *Metro Lights* alters the outcome in these cases, and

briefly discusses the opinion below in the context of the City's motion to reconsider the CRA Preliminary Injunction.

**36.** Although the Jamison TRO contained an Order To Show cause as to why that limited injunction should not remain in affect during the course of the litigation (Jamison TRO at 7–8), the Jamison–Sky Tag Plaintiffs instead have filed a motion for a preliminary injunction that, again, seeks relief as to all 118 locations.

not signs were put up prior to the ICO. The Court views the use of the term "imaged" and the failure to explain the true nature of these "smaller supergraphic signs" as misleading. However, McNeilly's reproachable conduct does not end there.

After the Court granted, in part, the relief the Jamison–Sky Tag Plaintiffs sought, they submitted the briefing currently before the Court. McNeilly again submitted a declaration with the Jamison–Sky Tag Plaintiffs' opening brief. This time he asserted that "all of the locations identified in the List of [118] Locations had supergraphic signs installed and in place prior to December 26, 2008." (Jamison McNeilly Decl. (Jamison Docket No. 73) ¶ 10; *see also id.* ¶ 33 ("all of Plaintiff's supergraphic signs identified in the List of Locations [ ] were installed prior to the effective date of the City's ICO.").) McNeilly abandoned the peculiar "imaged" language. If the use of "imaged" with no further explanation was misleading, the subsequent declaration—which still contained no explanation and dropped "imaged"—approaches an outright falsehood.

It was only after the City submitted pictures of various locations, noting the lack of Supergraphic Signs, that McNeilly filed a reply declaration that clarified that many of these sites contained "smaller supergraphic signs [ ] to indicate the location

of the intended full-size supergraphics." (Jamison McNeilly Reply Decl. ¶ 10.) It turns out that of the 118 locations which, according to McNeilly, "had supergraphic signs installed and in place prior to December 26, 2008" (Jamison McNeilly Decl. ¶ 10), in reality, only "33 of those locations had full scale supergraphic signs" (Jamison McNeilly Reply Decl. ¶ 10). For the remaining 85 locations, "smaller supergraphic signs" were used as place-holders.[37] (Jamison McNeilly Reply Decl. ¶ 10.) Until McNeilly submitted his reply declaration, the Court was led to believe that all 118 locations contained Supergraphic Signs. This was not the case. For numerous locations, instead of a Supergraphic Sign, McNeilly erected miniature signs.[38]

Aside from the fact that McNeilly's representations, until his reply declaration, were misleading, they appear to be false in fact as well. As the parties are now well aware, a Supergraphic Sign, by definition, does not comply with § 14.4.10 governing Wall Signs. McNeilly's various miniature signs actually appear to be Wall Signs governed by § 14.4.10 and as such, **would not be Supergraphic Signs.** However, the Court does not reach a conclusion in this regard because the Court does not have the exact specification for each miniature sign.[39] Regardless, McNeilly has no credibility before this Court.

---

**37.** Similarly, McNeilly's assertions as to the number of permits sought are also inconsistent. The Jamison–Sky Tag Plaintiffs only sought permits for 53 locations. (*See* Jamison Helt Decl. ¶ 20.) However, in the reply declaration, McNeilly asserts that "permits were being sought" as to 85 locations. (Jamison McNeilly Reply Decl. ¶ 10.)

**38.** As noted by counsel at oral argument, McNeilly did disclose that these were "smaller supergraphics" in a declaration he submitted regarding a request for a stay. (Jamison McNeilly Stay Decl. (Docket No. 37) ¶ 5.) However, counsel misses the point. In

conjunction with the motion before the Court, it was not until the Jamison–Sky Tag Plaintiffs filed their reply papers that McNeilly bothered to explain what he meant. Furthermore, as noted, McNeilly's initial representations in conjunction with this motion did not even use the laughable "imaged" language. If McNeilly thought he could make false statements now, but have them absolved by earlier "clarifications" made in unrelated papers, he was mistaken.

**39.** Visually, however, at first blush, most appear to fit within the strictures of § 14.4.10.

## B. RELIEF SOUGHT

 That lack of credibility, in turn, greatly limits the relief the Court will grant. The Jamison–Sky Tag Plaintiffs sought a preliminary injunction that would prohibit the City from interfering with Supergraphic Signs as to 118 locations. (*See* Jamison Proposed Order (Jamison Docket No. 74).) In light of McNeilly's declaration, there are only 33 locations at issue. To the extent the Jamison–Sky Tag Plaintiffs would put up Supergraphic Signs at the other 85 locations, those signs would be in violation of the ICO. Accordingly, there is no likelihood of success on the merits and the motion is **DENIED WITH PREJUDICE** as to those locations.[40]

As to the remaining 33 locations, unfortunately the parties did not brief these specific locations. The parties submitted evidence as to numerous locations, but none of this material is cross-referenced as to these specific 33 locations, i.e., it is not clear which locations constitute the 33 locations and the Court does not know if permits were sought for the signs at these locations, whether the signs at the locations have been cited, and, if so, what violations are being claimed. Accordingly, the Court needs additional information before it will grant further injunctive relief. If the Jamison–Sky Tag Plaintiffs continue to seek this relief, they should file a brief within seven days of this order identifying the signs at the 33 locations and the need for injunctive relief as to those signs. The City may file an opposition brief within 14 days of this order and the Jamison Sky–Tag Plaintiffs may file a reply brief within 21 days of this order.[41, 42]

## V. COMMUNITY REDEVELOPMENT ASSOCIATION LLC'S MOTION TO AMEND ITS PRELIMINARY INJUNCTION AND THE CITY'S MOTION TO RECONSIDER THE PRELIMINARY INJUNCTION

### A. LIBERTY'S MOTION TO AMEND

Community Redevelopment Association LLC, doing business as Liberty Media Group, ("Liberty") sought and received a preliminary injunction that enjoined the City from enforcing §§ 14.4.4.B.9 and B.11 as to signs at three locations. (CRA January 5, 2009 Order, 2009 WL 35352 ("CRA Preliminary Injunction") (CRA Docket No. 26).) In conjunction with that injunction, Liberty sought " 'the opportunity to submit a complete list of its sites and amend that list to add additional properties that it leases during the pendency of this litigation.' " (CRA Preliminary Injunction at 6 n. 5.) In the injunction, the Court denied that request. (*Id.*) However, at oral argument, the Court left open the possibility that additional sites could be added to the

---

**40.** A preliminary injunction requires that the moving party show "either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits." *Senate of the State of Calif. v. Mosbacher*, 968 F.2d 974, 977 (9th Cir.1992). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *U.S. v. Odessa Union Warehouse Co-op.*, 833 F.2d 172, 174 (9th Cir.1987).

**41.** For now, the Jamison TRO shall remain in effect.

**42.** Of course, the parties are free to resolve the dispute on their own. At this juncture, the Court's approach to these matters should be apparent. Although each case will be judged on the facts particular to that matter, as a general proposition, for Supergraphic Signs erected prior to the ICO, citations for failure to obtain a permit when a permit was actually sought are not likely to withstand the Court's scrutiny, while fire safety citations likely will.

list. Liberty has now filed a motion (CRA Docket No. 33) seeking to add 16 such sites. For the reasons discussed immediately below, the motion is **DENIED**.

■ As of December 26, 2008, Liberty did not have any signs at 15 of the locations. (*See* CRA Liberty Mem. (CRA Docket No. 33) at 1 ("Plaintiff has limited this motion to sites with which it had an agreement or letter of intent to erect signage prior to the effective date of the ICO (i.e., December 26, 2008).").) Accordingly, the relief sought as to those 15 locations is moot given the ICO. The Court is not persuaded by Liberty's arguments to the contrary.

Liberty cites *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) for the proposition that proving mootness is a "heavy burden." (CRA Liberty Mem. at 2.) However, *Friends of the Earth* addressed when a case is moot. The Court is not finding that Liberty's case is moot—or even that its challenge to §§ 14.4.4.B.9 and B.11 (CRA Complaint (Docket No. 1) ¶¶ 46–56) is moot. The Court simply finds that the particular relief sought by amending the preliminary injunction is moot.[43] The Court finds this case akin to *Covenant Media of California, LLC v. City of Huntington Park*, 377 F.Supp.2d 828 (C.D.Cal.

2005) (J. Morrow), also cited by Liberty. In *Covenant Media* the Court declined to grant preliminary injunctive relief against the City of Huntington Park when the City enacted an interim ordinance that modified the law being challenged in that action. *Covenant Media*, 377 F.Supp.2d at 836–842. In *Covenant Media*, the court declined to issue the requested injunction because, among other reasons, there was "no immediate likelihood [ ] that the Prior Sign Ordinance will be revived". *Covenant Media*, 377 F.Supp.2d at 837. Likewise, the Court here does not find it likely that the City will re-enact or further enforce §§ 14.4.4.B9 and B.11. Indeed, the ICO was enacted to allow the Planning Department to modify its regulations to both control the proliferation of signs and address the problems identified in the World Wide Rush Order. ICO at 1–2 (whereas clauses).[44] Accordingly, the motion to amend is denied as to the aforementioned 15 sites.

■ As to the one site where Liberty did have a sign prior to the ICO, 6800–6820 Hollywood Boulevard (CRA Luanghy Decl. (CRA Docket No. 35) ¶ 3), there is no evidence Liberty applied for a permit as to that site (*see* CRA Dickerhoff Decl. (CRA Docket No. 36) ¶¶ 2–4; *id.*, Ex. A).[45] Accordingly, the Court does not find that Liberty has shown a substantial likelihood of success as to the 6800–6820 Hollywood Boulevard Site.[46] *Senate of the State of*

43. Liberty's reliance on *Ballen v. City of Redmond*, 466 F.3d 736 (9th Cir.2006) suffers for the same reason. *Ballen* addresses whether the case, not preliminary injunctive relief, was moot. *See Ballen*, 466 F.3d at 741.

44. Granted, the City's failure to adhere to the World Wide Rush Order, and violation of the World Wide Rush Injunction, resulted in the contempt findings discussed above. However, the Court fully expects the City to take appropriate action going forward to comply with the Court's orders.

45. Nor does it appear that the City has any current orders to comply as to this site. (*Cf.*

CRA Luanghy Decl., Ex. C (attaching orders to comply issued over two years ago).) The City has initiated a criminal action in state court as to this location (CRA Luanghy Decl., Ex. C); however, Liberty is not a party to the criminal complaint; the complaint is directed to Liberty's lessors (CRA Luanghy Decl. ¶ 4).

46. The Court therefore does not address the allegation that Liberty is forum shopping as to this site (CRA City Opp. (CRA Docket No. 38) at 21–22) or the late-made assertion in the WWR case—and as such not relied on here—that the sign at 6800 Hollywood Boulevard is "being removed" "with full owner coopera-

*Calif. v. Mosbacher,* 968 F.2d 974, 977 (9th Cir.1992) (preliminary injunction involves consideration of the "probable success on the merits").

Accordingly, for the reasons set forth above, the motion to amend is **DENIED**.

### B. THE CITY'S MOTION FOR RE-CONSIDERATION

The City, both in the CRA matter and in the other matters noted above, argues that the Ninth Circuit's *Metro Lights* decision abrogates the World Wide Rush Order. The Court does not agree. As to §§ 14.4.4.B.9 and B.11, those sections were invalidated as the result of a facial challenge based on unfettered discretion. (World Wide Rush Order, 579 F.Supp.2d at 1316–25.) *Metro Lights* did not involve a facial unfettered discretion challenge—it involved a challenge under *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Accordingly, *Metro Lights* does not implicate the Court's rulings as to §§ 14.4.4.B.9 and B.11. In the World Wide Rush Order, the Court did invalidate § 14.4.6 under *Central Hudson.* (World Wide Rush Order, 579 F.Supp.2d at 1324–28.) However, § 14.4.6 is not raised in the current motions, so there is no need at present for the Court to examine what affect, if any, *Metro Lights* may have on the Court's conclusions as to § 14.4.6. Accordingly, the motion for reconsideration is **DENIED**.

## VI. FIGUEROA'S MOTION TO STAY

Figueroa Project 2 LLC, ("Figueroa"), brought a motion to stay in each case it has against the City. (CV 08–08508 (Docket No. 12); CV 08–05066 (Docket No. 16) ("Figueroa Cases").) The Court has reviewed the parties' briefing [47] and the motions to stay are **GRANTED**.

Unlike in many other Billboard Cases, no injunctions have issued in the Figueroa Cases. Figueroa seeks a stay pending the appeal of the World Wide Rush Order.[48] The City opposes a stay because it plans to "enforce all of its sign related regulations" (CV 08–08508 Opp. (Docket No. 16) at 1). The City fears that Figueroa intends to use the "stay as a subterfuge to obtain injunctive relief absent a full and proper record." (CV 08–08508 Opp. at 5.) The City fears Figueroa will obtain the stay, and then move, like every other plaintiff, for a preliminary injunction.[49] However, Figueroa addresses this fear, stating that "a 'premature application for injunctive relief' would only be realized if the stay request **is denied**." (CV 08–08508 Reply (Docket No. 17) at 3 (emphasis added).) Clearly, when faced with the City's assertion that it intends to enforce its regulations, Figueroa does not seek injunctive relief, but instead asks the Court to stay this matter.

Given that the stay will not prohibit the City from enforcing its lawful regulations, the stay is **GRANTED**. Not only does the

---

tion." (WWR Suppl. Fasmer Ex Parte Decl. (WWR Docket No. 216) ¶ 20.)

47. In CV 08–05066, the City did not oppose the motion and Figueroa did not file a reply or otherwise argue the City abandoned its defense. The Court presumes both parties "lost track" of the concomitant motion in CV 08–05066. However, both parties submitted full briefing in conjunction with CV 08–08508 and it is to that briefing the Court refers herein. (The opening motions and briefs in each matter are largely duplicative, save a

minor discussion of a proposed stipulation in CV 08–05066 (CV 08–05066 Mem. (Docket No. 17) at 4).)

48. The appeal in WWR is pending in the Ninth Circuit under Ninth Circuit Case No. 08–56454.

49. The City has additional arguments which the Court does not find meritorious, such as a reliance on *Metro Lights* and a claim that a stay will create confusion. (*See generally* CV 08–08508 Opp.)

Court find a stay warranted due to the pending appeal in World Wide Rush, but a stay is also justified considering that Metro Lights LLC has petitioned for an *en banc* rehearing of the *Metro Lights* decision[50], and considering that the City has not yet established the regulations that will follow the ICO. Regardless of these multiple considerations, the Court will tie the stay in this matter to the appeal of the World Wide Rush Order. Although this Court will readily learn the results of such appeal, the Court **ORDERS** Figueroa to file a notice of determination in the Figueroa Cases within ten days of a decision on the appeal of the World Wide Rush Order.

## VII. CONCLUSION

To the Court's extreme displeasure, the City has not acted appropriately in response to this Court's orders and the proliferation of signs in Los Angeles. As a result, this Court has found the City in contempt of the injunction for some of the citations it issued. However, even without the ICO, the City is still free to police the use of Supergraphic Signs and can cite Supergraphic Signs for violating myriad code provisions. The citations simply cannot stem from the City's refusal to allow the sign under §§ 14.4.4.B9 and B.11. Regardless, the ICO has rendered the City's previous reliance on §§ 14.4.4.B9 and B.11 largely superfluous.

The Court has likewise been less than pleased with the behavior of the sign companies. Although some Supergraphic Signs established prior to the ICO will likely remain, the World Wide Rush Order was not an open invitation to wallpaper the City with signs. As discussed herein, the Court has given leeway to a limited number of signs erected during a limited time

frame. However, that time frame came to a close with the ICO.

Going forward, the Court expects that the City's conduct, both in practice, and in drafting legislation, will reflect a principled approach to a serious issue that raises concerns not only as to the landscape of the City, but also as to the safety of its citizens. The Court can only hope that the billboard companies share those concerns.

As set forth above, as to the WWR Plaintiffs' motion for contempt (WWR Docket No. 208), the motion is **GRANTED IN PART AND DENIED IN PART.** The Court **FINDS** clear and convincing evidence that the City is in contempt of the World Wide Rush Injunction. The Court **ORDERS** the City to discharge the citations for §§ 12.21.A.1.(a), 14.4.16, 91.6201.2, and 91.6201.4 as to the 10801 National location **within 10 days** of this order. Furthermore, the Court **ORDERS** the City to discharge the citation under § 14.4.10 as to the sign on the North wall at the 10801 National location **within 10 days** of this order. The Court also **ORDERS** the City (and Fire Department) to discharge the citation for California Code of Regulations § 108.4.1 as to the 5150 Wilshire location **within 10 days** of this order.

As a sanction, the Court **AWARDS** the WWR Plaintiffs the fees and costs incurred in bringing their *ex parte* application (Docket No. 205) and this motion (Docket Nos. 208 *et seq.*). The Court **ORDERS** the WWR Plaintiffs to submit an accounting to the City **within 30 days** of this order. The City should make payment to the WWR Plaintiffs **within 40 days** of this order. If the City objects to the amount, and the WWR Plaintiffs are not able to reach agreement with the City

---

**50.** *Metro Lights* is docketed in the Ninth Circuit under Ninth Circuit Case Nos. 07–55179 and 07–55207.

on the appropriate recovery, the City can withhold payment and the parties should stipulate to, and submit to the Court, **within 40 days** of this order, a briefing schedule for resolution of the issue.

As to the remaining fire safety citations, the Court **ORDERS** the City to notify the WWR Plaintiffs, **within 10 days** of this order, as to how they can appeal the citations and/or meet the Fire Department's concerns. Lastly, the Court **ORDERS** the City and Fire Department to file a report with the Court, **within 60 days** of this order, as to how many Supergraphic Signs in the Hollywood SUD still cover windows and how many of those signs have been cited for fire safety violations.

As to the Jamison–Sky Tag Plaintiffs' motion for a preliminary injunction (Jamison Docket No. 71), the motion is **DENIED.** As to the 85 locations misrepresented by McNeilly, the motion is **DENIED WITH PREJUDICE.** As to the remaining 33 locations, the motion is **DENIED WITHOUT PREJUDICE** as the Court lacks sufficient information to rule as to those locations. If the Jamison–Sky Tag Plaintiffs continue to seek relief as to these 33 locations, they should file a brief within seven days of this order identifying the signs at the 33 locations and the need for injunctive relief as to those signs. The City may file an opposition brief within 14 days of this order and the Jamison Sky–Tag Plaintiffs may file a reply brief within 21 days of this order.

As to Liberty's motion to amend (CRA Docket No. 33) the injunction in that matter, the motion is **DENIED.** Likewise, the City's motion for reconsideration (CRA Docket No. 32) is **DENIED.**

As to Figueroa's motions to stay (CV 08–08508 (Docket No. 12); CV 08–05066 (Docket No. 16)), the motions are **GRANTED.** Those cases are hereby **STAYED** pending resolution of the appeal of the World Wide Rush Order. The Court **ORDERS** Figueroa to file a notice of determination in the Figueroa Cases **within ten days** of a decision on the appeal of the World Wide Rush Order.[51]

**IT IS SO ORDERED.**

---

**51.** The parties filed various evidentiary objections in these matters. The Court has considered these objections in reaching the conclusions herein and to the extent they are inconsistent with the Court's rulings are **OVERRULED.** *See Gates v. Deukmejian,* 987 F.2d 1392, 1400 (9th Cir.1992) (in addressing fee award district court not required to "make findings as to each of defendants' specific objections"); *Truck Terminals, Inc. v. C.I.R.,* 314 F.2d 449, 454 (9th Cir.1963) ("The fact that particular items of evidence were not mentioned in the findings or opinion of the Tax Court does not establish that they were not considered by that court.").